Shirley **WILKINS** and Reevis Wilkins, Plaintiffs-Respondents,

v.

**CASH REGISTER SERVICE COMPANY,** Defendant-Appellant.

No. 35263.

Missouri Court of Appeals, St. Louis District, Division One.

Jan. 21, 1975.

Amelung, Wulff & Willenbrock, James J. Amelung, St. Louis, for defendant-appellant.

James F. Koester, St. Louis, for plaintiffs-respondents.

KELLY, Judge.

Defendant appeals from a judgment for the plaintiffs in the sum of $15,000.00 on plaintiffs' claim for personal injuries and future surgical, hospitalization and medical expenses and for plaintiffs and against defendant on its counterclaim. We affirm.

Defendant does not challenge the sufficiency of the evidence to support the judgment insofar as the fault issue is concerned but contends that the verdict of the jury was so grossly excessive as to demonstrate bias and prejudice so that the entire case must either be reversed and remanded for a new trial on all of the issues or, in the alternative, this court should order a remittitur. As further grounds for a reversal and remand for a new trial there are other complaints of trial error which we shall hereinafter consider.

The facts of the collision from which this litigation has its origin are somewhat simple. On February 12, 1970, plaintiff-wife[1] was operating her 1967 Pontiac mo-

1. Hereinafter we shall refer to Mrs. Wilkins as plaintiff because her husband is not a party to this appeal. When a distinction is necessary for the purpose of clarification Mr. Wilkins will be identified as the plaintiff-husband.

tor vehicle northwardly on Ninth Street in the City of St. Louis, Missouri, at approximately 6 p. m., when a 1969 Ford Econoline van type truck being operated eastwardly on Cole Street by an agent of the defendant came into collision with the motor vehicle operated by the plaintiff in the intersection. Plaintiff was in the west curb lane of Ninth Street and defendant's van was in the south curb lane of Cole Street. There were two traffic lanes to the right of plaintiff when the van pulled into her path across her lane of travel when she was traveling approximately 20 miles per hour and 10 feet from the intersection. She sounded her horn, slammed on her brakes and skidded into the van so that the left front part of her automobile struck the right front side of the van. Plaintiff's two daughters were passengers in her car at the time of the collision and the elder daughter corroborated plaintiff's version of the manner in which the collision occurred. The younger daughter did not testify. Louis Ruddy, operator of the van, testified that he made the stop at the stop sign, looked to his right and saw that the way was clear, started across the street, and let his clutch out too quickly so that the engine of the van died. He applied the brakes and attempted to start the engine of the car again but was not successful and plaintiff collided with the right side of the van.

## I.

### PLAINTIFF'S INJURIES.

The plaintiff testified that at the time of the collision she flew forward striking her chest and stomach on the steering wheel, that her head and left elbow struck something and her head snapped back. At the scene she was too concerned about her daughters and did not become conscious of pain until she arrived home. She made no complaints of injury to anyone at the scene and refused medical attention offered by the police at that time. Plaintiff denied that she had any injury prior to the collision or any condition or trouble concerning her neck or her arm. Following the collision she was aware of her left arm hurting her and as the shock wore off she became aware of her neck hurting her. She sustained a knot on her head and a resulting headache. This collision occurred on a Thursday, she called her family physician on Friday morning but this call was relative to her daughters and not herself. Neither she nor the girls went to see this physician, Dr. B. Todd Forsyth, for any of the injuries she contends she sustained in this collision. The following Monday she went to Dr. Maurice L. Arms, a chiropractor, who had been recommended to her by a friend, at which time she was complaining about the knot on her head, her left elbow, which was black and blue, her chest, her stomach, and the entire right side of her body from her neck down through her right arm. Thereafter she saw Dr. Arms two or three times a week for the first year following the collision and three times in 1972. Dr. Arms referred her to Dr. Jacques Paul Schaerer at the end of 1971 because her condition was not improving despite a course of treatment including infrared heat, a metholator, ultra-sound and intermittent cervical traction. Dr. Arms' diagnosis was acute cervical strain and acute sternocostochondratis. He saw her a total of 26 times over a period of approximately 10 months; 5 times in 1971 and twice in 1972. Because of her long-term complaints that the muscles continued to be tight and stiff in the neck and shoulders on her right side he referred her to Dr. Schaerer for a neurological evaluation. In response to a hypothetical question he opined that the collision was the cause of her complaints and that her complaints of numbness and tingling in the fingers of her right hand and weakness in her right arm were symptomatic of a ruptured disc. He saw her last on November 22, 1972, in preparation for his trial testimony, at which time she continued to complain of the numbness and tingling sensation in the fingers of her right hand and his examina-

tion still revealed spot muscle tautness throughout the cervical region, restriction of head movement, and hypersensitivity at the levels of C–5, C–6 and C–7.

Dr. Jacques Paul Schaerer testified for the plaintiff by deposition. He testified that he specializes in the field of neurological surgery which includes the diagnosis and treatment of ruptured discs. He examined the plaintiff on December 22, 1971, at which time she complained of intermittent aching pain over the back of her neck radiating into the right shoulder and arm, and often all the way down into her right hand with generalized numbness associated with tingling in the right hand. She also complained of occasional dull ache and pain between the shoulder blades and of being more nervous and irritable since the date of the collision. The numbness in her right hand had grown worse whereas her other complaints had remained essentially the same. She denied having sustained any prior injury to her head, neck or low back. Examination revealed limitation of motion in the neck on hyperextension and rotation was limited to about 20% of normal and 30% of normal upon movement to the left with pain in the end position. He found suboccipital tenderness on the right where the head joins the neck in back and tenderness over the cervical spine in front and laterally in its mid-portion on the right side. He found marked spot tenderness over the upper medial angle of the right shoulder blade with spasm of the levator scapulae muscle on the right side and limitation of motion in the right shoulder joint, diminished reflex in the right tricep muscle and diminished sensation to pin prick over the ulnar aspect of the right hand. Fist grip measured 40 pounds on the left and 20 pounds on the right although patient was right handed. The clinical picture was one of a cervical discogenic pain syndrome with associated neurological findings indicating involvement of the C–7 and C–8 nerve roots. He was of the opinion that the source of the pain was a ruptured cervical disc. He testified that

this was a painful injury and would not heal itself. In his opinion plaintiff was suffering from a ruptured disc in the neck, therapy would do her no permanent good and if she desires relief, surgery was indicated. The surgery required to afford her relief would require the removal of the damaged disc, replacing it with bone and a fusion of the two vertebrae above and below the disc space. If such an operation were performed he would expect that she would be hospitalized for a period of 10 days and convalescent for at least six months. He further testified that the hospital charges would run between $1500.00 and $2000.00 and his surgical fee would be $1500.00; that these charges were fair and reasonable. In response to a hypothetical question, he also gave an opinion that the collision of February 12, 1970, caused the condition he found in the plaintiff when he examined her.

At trial time plaintiff's main complaints were concerned with the right side of her neck, her right shoulder, right arm and right hand, which she testified frequently gets numb. She testified that she is aware of some aches all the time, generally in the right side of her neck, sometimes in both shoulders and sometimes all the way down her right side. When she reads a newspaper or tries to sew a button on a garment her arm becomes numb. She described the feeling in her arm at various times as cold, having needles in it, and numb. She is right handed and the strength in the right hand has been lessened since the collision so that she now uses her left hand more often than she formerly did. She is not getting any better and will undergo the surgery suggested by Dr. Schaerer when she gets the money to pay his fee and the hospitalization. Because Dr. Arms' treatments are not benefitting her any longer she now attempts to get relief by taking hot showers, using hot towels and things of that nature. On cross-examination she denied having any prior complaints in regard to her right arm or hand and fingers and, more specifically, she denied seeing

Dr. Forsyth in February, 1967, for chest pains and numbness in her right hand or arm into the fourth and fifth fingers of her right hand as a result of an auto accident. She had been under Dr. Forsyth's care for approximately two years for hypertension and weight. In 1968, she did have some chest complaints but these were referrable to a gall bladder problem. She had been in an auto accident in August, 1968, but denied seeing Dr. Forsyth for any injuries sustained at that time.

Defendant called as witnesses, Dr. George L. Hawkins and Dr. Robert Mueller. Dr. Hawkins examined the plaintiff for defendant on January 26, 1972, obtaining a history of her complaints and conducting an examination relative to those injuries she contended were sustained in the auto collision of February 12, 1970. He concluded that she had no findings to account for her extensive complaints, appeared normal on examination and that the numbness of which she complained was not factual and could not be produced by an injury to her cervical spine. He found no evidence that she had a ruptured disc and in his opinion no operation was indicated. Dr. Mueller examined the plaintiff for the defendant on November 17, 1970, and he testified that as a result of his examination, although x-rays showed a flattening of the lordotic curve in the neutral position and some hypertropic changes in the area of C–4 and C–5, he could not demonstrate anything to his satisfaction to account for her complaints and he found nothing that would cause him to recommend that she consult a neurosurgeon.

In addition to these physicians who examined for the defendant, Dr. Bruce T. Forsyth, plaintiff's physician, was called by the defendant. He testified that plaintiff first came to him on February 1, 1967, complaining of headaches from the taking of an oral contraceptive pill and nervousness following an auto accident her son had been in in September, 1967. At this time she complained of a dull ache in her chest and of numbness of the fourth and fifth fingers of her right hand. He did not treat her for any of these latter complaints and considered them insignificant. On August 29, 1968, she called at his office on a regular visit and informed him at that time that she had been in an auto accident but he did not treat her for any injuries at that time. She called him on February 13, 1970, and told him that she had been in an accident the day before and that her abdomen, neck and wrist were sore. He advised her to use some nerve medication which he had given her on a previous occasion but he did not treat her for any injuries she complained about from the auto accident. On March 18, 1970, she came to his office and was complaining of quite a bit of pain in the lower part of her chest where she said she had struck the steering wheel of her auto. He had an electrocardiogram made which showed normal. Her blood pressure was up and he attributed this to the emotional turmoil following the auto collision. He furnished plaintiff's counsel a report in which he expressed his opinion that there was no likelihood of long range problems and that, as of the date of the report, March 18, 1970, she was essentially back to her previous state of health. Following the collision of February 12, 1970, he had no knowledge that plaintiff was under the care of any other physicians or doctors, but this was not the sort of information he would ordinarily have put in his notes and most of his testimony was based upon what he had in his notes.

Before undertaking a consideration of defendant's Points presented to this court as grounds for reversal and remand, although set out in three categories, we conclude that they can more succinctly be categorized into two groups: one, that the defendant was deprived of a fair trial because an inflammatory and prejudicial atmosphere was created by opposing counsel and the trial court resulting from cumulative error so that the jury rendered a verdict which was so excessive that the defendant was deprived of a fair trial and the judgment of the trial court must for

this reason be reversed and remanded for a new trial on all of the issues or at least a remittitur in the amount of the judgment must be ordered in this court. The second group concern certain procedural rulings including the trial court allowing the dismissal of Count II of the plaintiffs' petition—the husband's cause of action for loss of consortium and medical expenses—and the amendment of Count I of plaintiff-wife's petition thereafter to include future surgical and hospital expenses when there was insufficient evidence to support a submission of that nature. We shall consider these in inverse order.

## II.

## DISMISSAL OF HUSBAND'S CLAIM

■ At the time this case was tried Rule 67.01, V.A.M.R., provided that a plaintiff shall be allowed to dismiss his action without prejudice at any time before the same is finally submitted to the jury. Despite the wording of the Rule, Missouri case law holds that while the right of the plaintiff to dismiss his cause of action voluntarily and without prejudice should be freely granted and not be lightly abridged, that right is not absolute, and unless refiled within one year is barred thereafter. To overcome this right of the plaintiff, the defendant must bear the burden of proof that voluntary dismissal results in an undue advantage to the dismissing plaintiff or that by reason of such dismissal defendant would suffer an undue loss of a valuable defensive right. Stubblefield v. Seals, 485 S.W.2d 126, 129–130 [7, 8] (Mo.App. 1972). After the parties had closed and in a conference on instructions in the chambers of the trial court, plaintiffs' counsel dismissed Count II of the petition, without prejudice. Defense counsel at that point voiced no objection to this maneuver of plaintiffs' counsel but requested a withdrawal instruction as to the bill of Dr. Arms for treatment and services rendered the plaintiff-wife, which request was granted. When the instructions were read

to the jury an instruction withdrawing from the jury's consideration the "matter of Dr. Maurice Arms' bill" in addition to all evidence relating to whether the plaintiff-husband *"has been caused to incur"* medical expenses for medicines, doctors, x-rays, medical institutions and prescriptions and whether he would in the future be required to expend further sums was read. We hold the trial court did not err in this respect.

## III.

## PERMITTING THE AMENDMENT OF COUNT I OF PLAINTIFF–WIFE'S CLAIM AT THE CLOSE OF ALL OF THE EVIDENCE AND AFTER PLAINTIFF–HUSBAND HAD DISMISSED COUNT II.

■ The thrust of defendant's argument in the brief in this court on this point is that the case went to trial with "no claim by plaintiff in her suit, Count I, for medical expenses," that plaintiffs' counsel on voir dire advised the jury that the husband had been joined as a party for the wife's medical expenses; and that during the course of the trial evidence of Dr. Arms' bill and Dr. Schaerer's charges for surgery and hospital expenses for the operation came in without any objection on his part because at that time Count II was still in the case, and there was no basis for his objecting to this evidence with the pleadings in that shape. What defendant has apparently overlooked is that on January 10, 1972, when the cause was sent from the Assignment Division of the court to Division No. 4 of the Court, plaintiff obtained leave of court to amend paragraph 5 of Count I of the petition by interlineation by adding: "plaintiff has been caused to suffer injuries to the neck which have resulted in limitation of motion of the neck; that on December 22, 1971, plaintiff was examined by Dr. Jacques Paul Schaerer at which time it was determined that plaintiff has been caused to sustain a ruptured cervical disc, which will necessitate surgical

removal thereof; as a direct result of said surgery plaintiff will be required to expend additional sums for medical care and treatment, doctors and hospitals, the exact amount of which cannot be definitely ascertained at this time." (The underscored constitute the amendment by interlineation of January 10, 1972). On November 28, 1972, when the cause was assigned to Division No. 6 of the court the pleadings were thus, and defendant proceeded to trial without any attack on the pleadings by way of motion to elect, strike, etc.[2] Nor has he in any way demonstrated how this amendment at the close of the evidence by adding by interlineation paragraph 7 of Count I— "That plaintiff will be caused to incur medical expenses for hospitalization and surgery for the removal of a cervical disc" —resulted in an undue advantage or how defendant would suffer an undue loss of a valuable right in view of the foregoing.

■ With respect to his claim that the submission of future hospitalization and surgery for the ruptured disc is unsupported by the evidence, we conclude that there was sufficient evidence to go to the jury on that issue. Stephens v. Guffey, 409 S. W.2d 62, 69 [2, 4] (Mo.1966). Doctor Schaerer testified that if Mrs. Wilkins desired relief from her pains and the condition he found, it could be treated surgically and Mrs. Wilkins testified that when she got the money she was going to undergo the surgery recommended by Dr. Schaerer. This is sufficient to support the submission.

We rule this point against defendant.

### IV.

### DENIAL OF FAIR TRIAL

Prior to considering whether the verdict rendered in this case was excessive, we next consider defendant's charge that the case was tried in an inflammatory and prejudicial atmosphere, the result of action by the trial court and plaintiffs' counsel. It charges the trial court with permitting the attorney for plaintiffs to exert undue influence upon him in his rulings, says that the trial court was "mesmerized" by plaintiffs' counsel, and attempts to support these allegations against the trial court by enumerating some 29 instances wherein these charges are allegedly found during the course of the trial. Although we have studied each of these allegations and have avidly read the transcript for the purpose of determining whether the cumulative effect of these alleged errors constituted a deprivation of a fair trial, we shall not lengthen this opinion by enumerating each and every one of defendant's allegations of prejudice and inflammatory conduct on the part of the trial court and counsel for the simple reason that in most instances nothing was preserved for review in this court. In oral argument before this court, in fairness to counsel for the defendant, he candidly admitted that he was aware of this fact, but stated that he was so incensed at what he considered to be improper trial tactics on the part of his opposing counsel he was lumping them all together to "find out if this is the way to try a law suit." He explained his failure to make objections on occasion due to tactical considerations involved and requested that we nevertheless consider them "to get the feel of the case" despite his failure to preserve them for our review.

In our study of the motion for new trial and defendant's brief we conclude that the following sub-points were adequately preserved for review in this court.

A. Failure of the trial court to rule preliminarily on objections to the deposition of Dr. Schaerer out of the jury's hearing.

When plaintiffs' counsel, in open court, announced that he was going to read Dr. Schaerer's deposition, counsel for the de-

---

**2.** Defense counsel did not raise the issue of the right of plaintiff-wife to recover in her case for future medical expenses, surgical fees and hospitalization cost. However, see: Wors v. Glasgow Village Supermarket, Inc., 460 S.W.2d 583, 588 [5] (Mo.1970).

fendant, also in the presence of the jury, requested that the trial court afford him a hearing because there were some problems with the deposition which he would like to take up. Plaintiffs' counsel was opposed to this method of procedure and suggested that these objections could be taken up as they arose because it "will take hours to go through that deposition." [3] The trial court responded to defense counsel's request with: "Let's proceed." A colloquy between counsel and court followed until further discussions out of the hearing of the jury ensued wherein defense counsel attempted to point out to the trial court the wisdom of his motion to no avail and a ruling was made that the deposition of the Doctor could come in because he was a resident of another county. Discussion then turned to an objection by counsel representing the defendant at the taking of the deposition relative to the witness going off on a tangent in his answer to the prior question and a ruling by the special commissioner appointed to preside at the deposition that the objection was well taken. The trial court refused to rule on the admissibility of the objection and the ruling of the commissioner was called to the attention of the trial court and it was requested that both the objection and the ruling be omitted when the deposition was read into evidence before the jury. The trial court stated: "I am not pre-ruling." Defense counsel then inquired: "—as Mr. Koester begins to read each question, I should permit him to complete the question and then make my objection that I think (sic)." The trial court replied: "Right. Right. That's the way it is normally done." Undaunted, defense counsel again inquired of the trial court whether he did not want to consider any objection in the deposition at that time as to specific ques-tions, and was advised by the trial court that such a procedure "might be dangerous," that he had not read the deposition and in ruling on the objections he would be taking them out of context and he would rather cross them when he came to them. The trial was thereupon resumed and the deposition of the Doctor read into evidence.

While defendant has cited no authority requiring that a trial court rule on any objections that a party may have to particular questions and answers in a deposition prior to the reading of same into evidence under circumstances such as were apparent in the trial of this cause, we conclude that, when requested, it is often the better practice to grant said motion, make a preliminary inquiry and rule accordingly out of the presence of the jury thus obviating the harm which might accrue from the introduction into the record in the presence of the jury of questions, answers and rulings of a commissioner which are clearly inadmissible and prejudicial. Proceeding in this manner obviates the possibility, as too frequently occurred in this trial, of comment by counsel when an objection is interposed or when a ruling is made thereon and argument is put forth in an effort to have the trial court change its ruling which constitutes attorney-testifying rather than competent testimony of the deponent. The order of introducing evidence at trial is a matter within the sound discretion of the trial court and unless the trial court has palpably abused that discretion to the prejudice of the complaining party, a reviewing court will not interfere. Bedenk v. St. Louis Public Service Co., 285 S.W.2d 609 (Mo.1956); Siedler v. Tamar Realty Company, 491 S.W.2d 566 (Mo.App.1973). Reasonable men could differ with the trial

---

3. The deposition which gave rise to this request for preliminary rulings on objections consists of some 42 pages in toto. At the taking of the deposition counsel for the defendant posed 5 objections and during the course of trial after defendant's request for a preliminary ruling had been denied defense counsel interposed 4 new objections which had not been posed during the taking of the deposition, waived 2 objections which had been made then, and withdrew one objection to a reading of a partial objection. He was overruled on 3 of the objections made for the first time at trial and was sustained on one.

court in the handling of defendant's request, but viewing the totality of the circumstances of this case, the "free-wheeling" manner in which it was tried by counsel for both parties, the adversary nature of the proceeding, and the fact that defendant's counsel chose a tactical approach to the denial of his request for a pre-ruling on his objections whereby he withdrew or waived most objections, we conclude that it was not thereby deprived of a fair trial by reason of this ruling of the trial court.

■ Defendant argues that plaintiff's counsel stated to the jury that Dr. Schaerer could not be present because he is "in surgery." This statement was made by counsel for the plaintiff "without proof" defendant contends. At trial defendant's objection was directed to the admissibility of the deposition on the grounds that it had not been established that the Doctor could not be available to testify in person. His objection was sustained and he sought no further relief from the trial court at that time. It argues that this statement that the Doctor could not be available because he was "in surgery" was an argument to the jury unsupported by the evidence. On September 15, 1972, when the deposition of the Doctor was taken he testified that he was a resident of St. Louis County, Missouri; a medical doctor specializing in neurological surgery and that he was engaged in his official duties as a medical doctor every day of the week. He also advised plaintiffs' counsel that he might not be available to appear personally in court because of his surgical schedule. There is no evidence in this record from which we can determine whether the deponent was available to appear in person on the date his testimony was offered by deposition on November 29, 1972, and any statement to that effect by counsel was certainly improvident without proof. However, the deposition came in under the provisions of Rule 57.29(b)(4) on the ground that the deponent was a resident of a county other than that in which the trial was held. The same Rule likewise provides that "[t]he facts which would authorize the reading of the deposition may be established by the testimony of the deposing witness . . ." In the absence of any evidence to the contrary the deposition was admissible and the trial court was correct in its ruling. Smith v. Wabash Railroad Company, 416 S.W.2d 85, 89 [8] (Mo. banc 1967); Myers v. Karchmer, 313 S.W.2d 697, 701 [1–3] (Mo.1958). Despite the unsupported statement of counsel, which we have held to be improvident, we do not conclude that it was so prejudicial as to require reversal.

B. Error of trial court in permitting the plaintiff, over objection, to repeat and thus highlight testimony of Dr. Schaerer that traffic accidents are the most common cause of disc injury.

■ During the direct examination of Dr. Schaerer at the taking of the deposition inquiry was made by plaintiffs' counsel: "In your experience as an operating neuro-surgeon what is the most common cause of disc ruptures?" The Doctor was permitted, without objection, to reply: "Automobile accidents." On cross-examination this matter was not gone into, but on re-direct plaintiffs' counsel propounded a question: "That is just the point that I am trying to make; I know there are some things that can cause a ruptured disc in the neck other than a traffic accident, but by the great majority, are they all automobile traffic accidents?" An objection was interposed when the deposition was taken and when counsel at trial reached this same point in the deposition, defense counsel objected on the grounds "it is repetitious, highlighted and prejudicial." The objection was overruled and the answer read into evidence. It is obvious that the objection was well taken and should have been sustained. While the rule in this state is that the admission of incompetent evidence on a material issue is presumed to be prejudicial unless clearly shown to be otherwise, State ex rel. State Highway Commission v. Baker, 505 S.W.2d 433, 437 [5] (Mo.App.1974), this evi-

dence came in without objection in the first instance, was before the jury and was a competent expression of a medical opinion based upon experience of the witness in his speciality. Although repetitious and tending to highlight we cannot conclude that the failure of the trial judge to sustain the objection constituted prejudice which would require a reversal of the judgment and we so hold. Defendant, in an effort to support his contention that an inflammatory and prejudicial atmosphere was hovering over the trial, argues that at a later point in the trial when defense counsel asked leave of court to pass to the jury two affidavits of Dr. Schaerer an objection of plaintiffs' counsel that defendant "wants to highlight by using the affidavit that was used to cross-examine Dr. Schaerer about the amount of depositions that he has given and his findings, and so forth" was sustained. The affidavits referred to were concerned with the number of times the Doctor's deposition had been taken on behalf of plaintiffs in 1969 and 1970, the number of individuals he had examined, treated and tested for plaintiffs' attorney in 1969 and 1970, and the number of times per week his deposition had been taken on behalf of patients represented by plaintiffs' lawyer in the same two years. The purpose of these affidavits were, according to counsel for the defendant, to "self-impeach" the witness-deponent. A lengthy discussion followed during which defendant's counsel pointed out to the trial court that while he had read from the deposition those portions of the affidavits referred to therein, he had not read directly from the affidavits themselves which had been marked as exhibits both at the time the deposition was taken as well as during the course of trial and had been admitted into evidence. The trial court sustained the objection but permitted defense counsel to read to the jury a paragraph of "trial exhibit 5–B": "The maximum number of

depositions given by me on behalf of patients represented by Attorney James F. Koester during one week during the years of 1969 and 1970 was four." Dr. Schaerer was extensively examined relative to the two affidavits during the taking of his deposition for the purpose of showing that in one of the affidavits he had stated that he could not furnish the information requested because his appointment book for the years covered had been discarded or his other records were not available and in the other, executed some nine months later, he was able to furnish the "approximate" numbers sought. Whether documents in evidence should be put in the hands of the jury for inspection during the trial is within the discretion of the trial court. 88 C. J.S. Trial § 61 (1955); Zweifel v. Milwaukee Auto. Mut. Ins. Co., 28 Wis.2d 249, 137 N.W.2d 6, 13 [15] (1965); Barton v. Dyer, 38 Idaho 1, 220 P. 488, 489 [3] (1923). We find no error in the manner in which the trial court exercised its discretion with respect to this point.

■ C. Error in granting leave to plaintiff to file a reply to defendant's counterclaim after all of the evidence was concluded.

Defendant next contends that the trial court erred in granting leave for the plaintiff to file an answer to its counterclaim at the close of all of the evidence. The argument of defendant in support of this ground is based more on a criticism of the unpreparedness of plaintiffs' counsel than any prejudice the action of the trial court may have had with respect to the defendant's ability to proceed with the trial of the case. Defendant on July 15, 1971, filed its Answer to Count I of plaintiffs' petition and counterclaim for damages sustained by its van as a result of the collision.[4] On November 28, 1972, after the cause had been assigned for trial and during the

4. Defendant also filed an Answer to Count II of plaintiffs' petition on July 23, 1971; but not until its motion to dismiss Count II thereof for failure of plaintiff to comply with the provisions of Rule 66.01(c) had been sustained in part and the husband's allegations relative to damage for loss of consortium had been ordered stricken.

course of a pre-trial conference with the trial court, defense counsel inquired of plaintiffs' counsel the name of the insurance liability carrier for plaintiffs preparatory to requesting leave of court to pose the usual "insurance question" on voir dire. Plaintiffs' counsel stated that he did not represent the liability carrier, that he did not think the liability carrier was represented in the cause, and that he had no authority to enter an appearance for it. Plaintiffs then moved for a separate trial of the counterclaim and this motion was denied, but the trial court granted plaintiffs leave to file an answer to the counterclaim and proceed to trial. At the conference on instructions after the conclusion of the evidence, plaintiffs' counsel asked leave to file the Answer to defendant's counterclaim in the nature of a general denial and a defense of contributory negligence for failure to yield the right of way. Despite defendant's objection that although leave had been granted for this purpose during the pre-trial conference and counsel for the plaintiffs still had not filed a written Answer, the trial court granted leave. On December 1, 1972, a written Answer to the defendant's counterclaim was filed on behalf of the plaintiffs in the nature of a general denial and it alleged, as a defense, "that any damages which may have been sustained by defendant, were the direct result of their (sic) driver, Louis Ruddy, Jr." The defendant did not move for a default and proceed to judgment on the counterclaim as it could have done in the absence of any pleadings thereto, and in the absence of any showing how its rights were prejudiced, we rule this point against defendant.

D. Domination of Court by plaintiffs' counsel in matters of evidence and conduct of the trial.

■ The next point, that the trial court permitted itself to be dominated by plaintiffs' counsel in matters of evidence and the conduct of the trial to the prejudice of the defendant, like so many other points, preserves nothing for review. Rule 84.04(d). This Point is directed, we glean from the argument section of its brief, at certain remarks of plaintiffs' counsel which were inappropriate, the improper reference to testimony in a deposition and an accusation that a witness for the defendant had "changed" his testimony. In cross-examination of Mr. Ruddy, defendant's driver, plaintiffs' counsel asked: "Q. You do know she had the right of way?" The witness replied: "Yes." After the answer was in defense counsel objected to the question on the grounds that it was a legal conclusion "and legal description," and the trial court overruled the objection and said that the witness could answer. This objection came too late in the absence of any showing that the defendant was prevented from making a timely objection.

■ As another ground for reversal and remand under this Point defendant complains that while the same witness was being cross-examined by plaintiffs' counsel the following occurred:

"Q. (By Mr. Koester) Now, when the crash occurred, was your car knocked one-fourth of a turn, approximately, as a result of that impact?

A. About three feet.

Q. Then, how much does that truck weigh?

A. I have no idea.

Q. Well, whatever it weighs, it spun, as you said in your deposition, about a fourth of a turn.

MR. AMELUNG: Your Honor, I will object to that. The witness testified, now, three feet.

MR. KOESTER: Well, he changed it.

THE COURT: It is cross examination. He may answer."

That this line of interrogation by reference to a deposition is improper is so apparent that it is unnecessary to cite any authori-

ties in support of the point. This is not the proper method for using a deposition to impeach a witness and counsel know, or should know, that. Nor is the comment by plaintiffs' attorney that the witness had changed his testimony in this context a proper means of impeachment. The proper procedure is set out in Littig v. Urbauer-Atwood Heating Co., 292 Mo. 226, 237 S. W. 779, 785 [11] (1921), and Slaughter v. Sweet & Piper Horse & Mule Co., Mo. App., 259 S.W. 131, 135 [8, 9] (1924); Peppers v. St. Louis-San Francisco Ry. Co., 316 Mo. 1104, 295 S.W. 757, 761 [11] (1927). Nevertheless, we conclude that this point is not sufficiently grave to constitute reversible error when the grounds for the objection was not specifically stated to be the improper use of the deposition testimony of the witness to impeach him on this point and counsel for the defendant, in stating his objection, also engaged in some "counsel testifying" by restating the witness's prior testimony on the point. Defense counsel argues that by his ruling the trial court lent credence to the statement of plaintiffs' counsel that the witness had deviated from his testimony in the deposition. The ruling of the trial court did not so infer; all it did was permit the witness to answer the question next propounded to him:

"Q. (By Mr. Koester): Did you tell me in your deposition that it knocked it a fourth of a complete turn around?

A. Not a complete turn. I mean, like, it knocked it about three feet. It moved the front end of the truck over about three feet, which was about a fourth of one turn, like a ninety degree turn."

Neither side in this case shed any light on exactly what Mr. Ruddy said in this respect in his deposition and we are therefore unable to determine from this record whether plaintiffs' counsel was or was not correct when he accused the witness of changing his testimony. In view of the witness's answer to the question last stated we conclude that despite the improper use of the deposition, by stating what the witness allegedly said therein, by plaintiffs' counsel, no prejudicial error resulted which calls for reversal of the judgment in this case.

E. Error in plaintiffs' counsel's use of 36 index cards to cross-examine without supportive evidence.

Defendant's next contention is that the trial court improperly permitted counsel for the plaintiff to "put 36 index cards of information before the jury without supportive evidence." Throughout the trial of this case counsel for both the plaintiff and the defendant sought to attack the credibility of the medical experts produced by the other party by interrogating them relative to how many times they examined individuals sent to them by attorneys engaged in litigation either as plaintiffs or defendants, how many times their testimony was given in such cases either by deposition or in person, and what lawyers or law-firms the doctors did business with. Defendant chose to cast doubts on the testimony of Dr. Schaerer by use of the affidavits mentioned supra and cross-examination during the taking of his deposition. One of the methods used by plaintiffs' counsel in the cross-examination of Dr. Hawkins and Dr. Mueller was by use of some index cards—36 in number he said—which he stated he compiled by checking the cases in his office wherein Dr. Hawkins was the examining physician for the defendant. After this preliminary statement plaintiffs' counsel said: " . . . I will ask if you do remember if you examine for these defense firms? Do you examine for—" At this point defense counsel stated to the trial court that he might have to call plaintiffs' counsel as a witness and that he wanted to make a record. A colloquy between trial court and counsel at the Bench then followed and defendant's counsel objected on the grounds that this statement of plaintiffs' counsel was improper because it told the jury, without evidence, that whatever cards he had was a compilation of a list of cases in which Dr. Hawkins had testified.

The thrust of this objection as stated by defense counsel was that if these cards were permitted to be used then he would have a right to examine opposing counsel or check his records to determine whether, as he sought to convey, Dr. Hawkins actually had that many cases with that office. A request was then made that the trial court instruct plaintiffs' counsel to refrain from exhibiting the group of index cards and referring to them and insinuating that he had run a check of his office records and that these index cards indicated the number of cases wherein Dr. Hawkins had testified when plaintiffs' counsel was the attorney. The trial court ruled as follows: "Well, it will be overruled. I am not going to direct anybody how to try their lawsuit." After this ruling plaintiffs' counsel handed the cards to Dr. Hawkins as he said: "Dr. Hawkins, I will hand you thirty-six cards which contain your name and the name of my client and the name of the firm, the law firm who referred the case to you. I'd like to have you look at those cards and tell me whether you have done those examinations on my clients, and those are the firms that you have done them for?" Defense counsel interrupted and asked that he be afforded an opportunity to review the cards prior to the Doctor being allowed to answer the question propounded to him. The trial court granted him permission to do so. After examining the cards defense counsel asked that they be marked as exhibits if they were going to be used and plaintiffs' counsel replied that he had no objection to having them marked. A series of questions was then asked of Dr. Hawkins concerning whether he did examinations for a number of law firms and lawyers during some of which at least reference was made to one or more of the aforesaid index cards. Dr. Hawkins acknowledged that he did do some examinations for certain of the lawyers and law firms mentioned on the index cards and on others he either said he did not recall either the lawyer of plaintiff-counsel's client named thereon. The cross-examination then turned to whether he did examina-tions on Workmen Compensation cases, and whether these were done for certain named attorneys who represented the employer. He was asked if he had examined for a number of law firms and individual attorneys, the major part of whose practice is in the defense of claims, and in most instances Dr. Hawkins answered that he had. He testified that he has seen patients who are involved in medical-legal problems since he started to practice medicine in 1950.

While generally a trial court may not dictate the trial strategy or tactics of counsel in the trial of his case, State ex rel. Foster v. Price, et al., 426 S.W.2d 921, 926 [2] (Mo.App.1968), it may, nevertheless, rule with respect to objections posed to it concerning the admissibility of evidence even where, by so doing, the trial tactics and strategy of counsel might be curtailed or directed into appropriate avenues to achieve a proper end. Cross-examination of witnesses, its scope and extent, particularly in civil cases, must generally lie within the sound discretion of the trial court and in the absence of abuse the trial court will be sustained. Stafford v. Lyon, 413 S.W.2d 495, 498 [6] (Mo.1967). We conclude that the manner in which plaintiffs' counsel commenced the examination of the medical witness by stating that he had in his possession 36 index cards which he had compiled by checking the cases in his offices was improper since it constituted "counsel-testimony" unsupported by any evidence in the case and attempted to add credibility to the contents of the cards which had not at that time been established and was never established throughout the entire trial. It is improper to so frame cross-examination questions that they are argumentative or call for a conclusion, or assume facts. Eddings v. Keller, 400 S.W.2d 164, 174 [11] (Mo.1966). We further conclude that it is likewise improper to attempt to put the witness at a disadvantage by telling him what the attorney's files reflect when there is no evidence to support that statement by counsel. This

does not mean, however, that counsel during the course of a proper cross-examination may not refer to records compiled by himself or others for him from his files for the purpose of aiding him in the conduct of the cross-examination, it merely restricts his oral pronunciations to the jury and the witness that the source of the index cards to which he refers for the purpose of framing his questions is his office files. Despite the improper remark with reference to the source of the index cards, we conclude that no prejudicial error resulted because of the testimony of the Doctor witness admitting that he had, in the course of his practice over the years, examined and appeared as a witness in litigation for lawyers and firms of lawyers engaged in the defense of damage suits and Workmen's Compensation claims.

F. Error in permitting plaintiff's counsel's use of model spine in argument.

██ Defendant's next contention is that the trial court erred when it permitted plaintiffs' counsel during argument to use plaintiffs' Exhibit A—a model of a spine—despite the fact that the exhibit had not been formally introduced into evidence. The trial court overruled the objection to the use of the model spine on the grounds that it had already been exhibited to the jury, used during the examination of Dr. Arms and the jury was not going to see anything it had not seen earlier during the course of the trial. An exhibit once marked and used, is in evidence just as if it had been formally introduced and may be used by either of the parties. Bolhofner v. Jones, 482 S.W.2d 80, 85 [6] (Mo.App.1972); Nutz v. Shepherd, 490 S.W.2d 366, 371 [10] (Mo.App.1973). There is no merit to this contention.

██ Defendant further alleges that the trial court erred in sustaining the objection of plaintiff's counsel when, during argument the defendant told the jury that the plaintiff would not have an operation of the kind described by Dr. Schaerer without first checking with another doctor. In context, this was invited by the defense counsel who in the first instance told the jury that the plaintiff would never have an operation and the trial court sustained plaintiff's objection to this line of argument. Ignoring this ruling of the court, defendant proceeded to argue: "I will say another thing. She (plaintiff) will not have an operation without checking with some other doctor." Under the circumstances, in the absence of any evidence in support of this argument immediately after an objection to similar argument had been sustained by the trial court, we hold that defendant's counsel precipitated the ruling of the trial court and cannot be heard to complain when he forged ahead in the face of the prior ruling.

G. Error in failing to reprimand counsel during closing arguments.

Although raised with those alleged trial errors concerning the dismissal of the plaintiff-husband's cause of action in Count II of the petition and the granting of permission for the plaintiff-wife to amend Count I of her petition to include therein future hospital and surgical expenses for a disc operation, we choose to consider this point under those points we have gathered together with respect to the denial of a fair trial to the defendant.

The thrust of defendant's argument on this point relates back to the cross-examination of the plaintiff relative to the distance within which she could bring her auto to a stop at a speed of twenty miles per hour. At trial when this question was propounded to her she answered that she did not know. Defendant's counsel thereupon, for the purpose of refreshing her recollection, referred her to her deposition, and asked: "Let me ask you if you remember being asked how long it would take you to stop at twenty miles per hour, and if you indicated that you could stop in twenty foot?" At this point, and before an answer was proffered, plaintiff's counsel objected to the method of cross-examining without any reference to the page number of the deposition or any reference

with which the accuracy of the alleged answer could be checked. This objection was overruled and the defense counsel then inquired: "Do you have a recollection of such testimony?" The witness replied: "If it was in the deposition, yes, sir. Offhand, I don't—" Defense counsel interrupted and according to the record handed the deposition to the witness, showed her the question and answer in the copy of the deposition in her hands, and then commenced reading from the copy of the deposition in his possession a question on that issue and her answer thereto, that under the conditions existing at the time of the collision, and while operating her motor vehicle at 20 miles per hour she could bring her vehicle to a complete stop upon the first sign of danger within "about twenty foot, probably." When asked if that was the answer she gave, she replied, "Yes, sir." Defense counsel then inquired: "And, is that the truth?" Plaintiff's counsel thereupon objected to "further interrogation" unless defense counsel "reads all of that interrogation related to that answer, because on the next page, she says, 'I would imagine. I don't know.'" Defense counsel objected to plaintiff's counsel reading the deposition on the grounds that it was not proper for him to do so at that time and if he wanted to "read parts of it on re-direct examination, he has that right." The trial court sustained the objection of defense counsel and advised plaintiff's counsel that he could read it on re-direct examination. Despite this ruling of the trial court plaintiff presented no re-direct of this witness and did not attempt to read any parts of the deposition to explain this answer of the plaintiff with respect to stopping distances.

In argument, defense counsel engaged in the following argument on this point:

"Now, Mr. Koester hollered like a wounded cougar when I read that part of the deposition of plaintiff Wilkins, about her being able to stop within twenty feet. And I won't get it out, take the time to read it to you, but I am asking you to remember this one thing: You will remember when I read that she could stop within twenty feet, Mr. Koester hollered and screamed, and he said, 'Let's read it all.'

"That was a good tactic. That's good trial tactics because that tells you, maybe I am being unfair. And you will remember that the objection was overruled. The Court said that he could read any part of that deposition that he thinks that he should have read or that might make the answer more clear. Did you hear him or see him read one part of that deposition? And I have to remind you of this because at the time it may have looked to you like I was being unfair in reading just something.

"MR. KOESTER: I will object to this, Your Honor, because what he did, he only read part of it.

"THE COURT: He may explain.

"MR. AMELUNG: Your Honor, I ask counsel be reprimanded for that remark. That is certainly improper.

"MR. KOESTER: That's true. That's certainly what you did.

"THE COURT: Proceed, gentlemen; you know the rules. Let's go.

"MR. AMELUNG: He had a right, at that time, to read any part of that deposition that he wanted to read, which he thought might explain. Did he read any part of that deposition? He did not. Some more tactics . . ."

Defendant argues that the tactics employed by plaintiff's counsel served the purpose of advising the jury that a different view might have been obtained if the defendant had read more of the plaintiff's deposition and effectively neutralized the adverse effect of the impeachment of plaintiff's testimony by use of the deposition in cross-examination. Repetition of this tactic during argument afforded plaintiff's counsel another opportunity to get before the jury "unsworn testimony" on this same point and defendant contends

that his request for reprimand should have been sustained but was "in effect refused" when the trial court said, "Let's proceed."

▮▮▮▮ The objection of plaintiff's counsel was an improper interjection into defendant's argument and in direct violation of the ruling of the trial court when this matter occurred during trial. It was an effort on the part of plaintiff's counsel to overcome in the eyes of the jury a ruling of the trial court which had gone adverse to his position. This is improper trial tactics and cannot be condoned. However, it is the failure of the trial court to reprimand plaintiff's counsel that is raised here as grounds for reversal. While the trial court did not state that defense counsel's motion for reprimand was denied, by responding "Proceed" it did what was tantamount to overruling the objection and stamping the alleged conduct of plaintiff's counsel in this respect as proper. Dunn v. Terminal Railroad Association of St. Louis, 285 S.W.2d 701, 709 [12] (Mo.1956). However, the matter of reprimanding counsel is discretionary with the trial court, Hunt v. Hunt, 423 S.W.2d 682, 684 [2] (Mo. banc 1968), and when viewed in the context and defense counsel's following argument we hold that this failure to reprimand did not constitute an abuse of discretion which would warrant reversal of the judgment in this case.

▮▮▮▮ The numerous other points under this heading were not properly preserved for review but are of the same nature as those we have disposed of supra and would not cause us to arrive at a result in conflict with what we have heretofore held.

Since the trial court committed no prejudicial error and any errors in its rulings were either obviated by subsequent testimony in the case or by the failure of the plaintiff's counsel to pursue the course of inquiry or the introduction of the matters complained of by defendant, we conclude that the cumulative error rule has no applicability to this case.

▮▮▮▮ With respect to the defendant's contention that the verdict of the jury is excessive and its suggestion that an award of $1000.00 to $2500.00 would be adequate, we undertake the review of the jury award and the evidence in a light favorable to the plaintiff. The credibility of the plaintiff and her witnesses as well as the weight to be given said testimony were questions for the jury. Skadal v. Brown, 351 S.W.2d 684, 688 [5] (Mo.1961). We will not undertake to restate the evidence at this stage of the opinion but we have determined that the amount of the jury verdict does not indicate passion and prejudice requiring a reversal or an appeal, nor any remittitur. Setting the amount of the verdict was an exercise of the jury's fact-finding power, a power we are reluctant to curtail. It is only in those instances where the amount of the judgment is grossly excessive and shocking to the judicial conscience that an appellate court will interfere. We do not find either of those elements present in this verdict and judgment, and we rule this point against the defendant.

Affirmed.

SIMEONE and WEIER, JJ., concur.