ALEX TAYLOR, Respondent, v. THE KANSAS CITY SOUTHERN RAILWAY COMPANY, a Corporation, Appellant, No. 43641—266 S. W. (2d) 732.

Division Two, March 8, 1954.

Motion for Rehearing or to Transfer to Banc Overruled, April 12, 1954.

*Richard S. Righter, Winston H. Woodson, James F. Walsh* and *Lynn M. Ewing* for appellant.

694

*Jo B. Gardner* for respondent.

BOHLING, C.—The Kansas City Southern Railway Company, a corporation (defendant-appellant), appeals from a verdict and judgment of the circuit court of Vernon county for $40,179 in favor of Alex Taylor, an employee, for injuries sustained in a fall on steps maintained by the defendant. Defendant says plaintiff failed to make a submissible case on causation because there was no substantial medical evidence that plaintiff's injuries were caused by the fall involved; that error occurred in the admission of certain evidence, and that the damages are excessive.

Plaintiff was injured on January 1, 1952, at Watts, Oklahoma, a town of approximately 300. Defendant's station is west of its tracks, and the town is west of and higher than the station platform. There is a terrace about 8 feet high between the station platform and the street west of the station. Places had been cut in the terrace and discarded crossties laid therein for steps to the north and also to the south of the station for use by the public and the train crews. These steps were about 64 inches in height and consisted of eight crossties. The street was 6 to 8 feet west of the top step. There were two electric lights, with reflector fixtures, on poles about 15 or 20 feet high on the station platform. One was north of the station and the other was at the bottom of the south steps. Plaintiff testified that the light on the pole at the south steps had been out for a year or more, and that rains had washed cinders and gravel onto the south steps for a long time.

Watts was a terminal for defendant's freight crews. Defendant's trains were operated under train orders. Plaintiff had worked at Watts since December, 1944, acting as telegrapher, agent and call boy. At the time of his injury he was about 50 years of age and was on the midnight to 8 a.m. shift. He received a call from his dispatcher at 3:00 a.m. to call a crew for a troop train due at Watts at 4:00 a.m. The night was cloudy and dark. He used a regular Genesee switchman's lantern. The batteries in this lantern had been used and the light was dim. Plaintiff knew this but testified there were no batteries for replacement. The regular time allowed for calling a train crew was one and a half hours; anything shorter was a "short call." It took about 20 to 25 minutes to call a crew. After calling the crew, he used the south steps to return to the station. He was in a hurry to place the mail for a passenger train due at 3:35 a.m. He was walking fast, and when he struck the loose gravel and cinders on the top step, his feet went out from under him. He grabbed the south handrail with his right hand, but it snapped off and fell on top of him. He was thrown with his back, his neck, and his head striking the steps and his right shoulder and forearm were bruised. He was unable to walk and crawled to the station, where defendant's roadmaster and helper were waiting to take the passenger train. Plaintiff suffered intense pain in his back and the back of his head. His hand and arm seemed dead. He could not continue his work and was taken to the hospital at Siloam Springs, Arkansas. He was in the hospital for 11 days when, according to plaintiff, Dr. Blauw, the attending physician, informed him he had received orders to dismiss plaintiff and he could either go home or to Kansas City to see the Chief Surgeon, Dr. W. P. Miller. Four days later plaintiff went to Kansas City, and was examined by Dr. Miller, who gave him some pills and told him time would take care of his back.

Plaintiff testified that his head hurt all the time; that his back hurt; that his right arm and right leg bothered him; that he could not sleep at night; that Dr. Blauw recommended that he receive deep heat treatments and physiotherapy, and use a back brace or corset, but Dr. W. P. Miller said these things were not necessary.

Plaintiff returned to regular work for defendant on January 18, 1952. His work caused him to suffer pain and he had difficulty doing it. He consulted a bone specialist in March, 1952. He filed suit on April 10, 1952. He lost 4 days time up to July 3, 1952, when he quit. His semimonthly pay checks approximated $120. His last pay check was $199.91. The only doctor he had been to after filing suit was Dr. Blauw, whom he stated he saw about 6 or 8 times. He purchased no back brace or corset, costing between $10 and $50.

Dr. Robert A. Hayne, a neurosurgeon of Tulsa, Oklahoma, examined plaintiff on September 22, 1952. His deposition was taken October 14, 1952. His testimony was based on his personal examination of plain-

tiff and x-rays. He found no fractures. Plaintiff had a herniated intervertebral disc at the fifth lumbar interspace, likely bilateral in character. Osteoarthritis of the lumbar spine, considered in part to be post-traumatic. Abnormalities in the cervical spine, primarily osteoarthritis, also considered in part post-traumatic, with impingement on the intervertebral foramina, the opening through which the nerves pass. Mild osteoarthritis of the right shoulder. He estimated plaintiff had a 20 to 30 percent loss of sensation on the left side of his left foot and over his lower right extremity; that plaintiff's right grip was 40 percent normal; that palpation along the affected areas of the spine and right shoulder were moderately painful, and the strength of plaintiff's lower extremities were, roughly, within normal.

He stated that arthritis of the neck and spine was permanent, but its severity would fluctuate. He also testified that osteoarthritis is primarily degenerative, a disease but may be caused by trauma; that it was impossible to differentiate between osteoarthritis of a degenerative character and post-traumatic osteoarthritis on the basis of x-rays or clinical examinations.

It was his opinion that plaintiff's symptoms were directly related to his fall of January 1, 1952.

Asked what effect a laminectomy would have on the cushioning effect of the disc, he stated: "It probably impairs the cushioning effect of that disc, but the total cushioning effect in the spine is not appreciably involved with the normal discs above." Asked to state what permanent injuries he found, he answered: "Permanent injury in the lumbar spine, secondary to such as an intervertebral disc injury is ordinarily from 10 to 15 percent total permanent"; "I would estimate that there would be a disability as a whole, total permanent secondary to the cervical spine injury following treatment, in the neighborhood of 15 to 20 percent"; and he estimated plaintiff's permanent disability, assuming successful treatment, "probably in the neighborhood of 20 to 25 to 30 percent." We read his testimony to relate to the functioning of the involved parts. He stated: "I do not feel that he will be incapacitated from carrying out the work that he has ordinarily done"; that there would be some additional difficulty in doing it; less able to do heavy lifting with his right upper extremity or writing for prolonged periods of time; that plaintiff "may have some variable degree of pain referable to his lumbar spine and to his neck, possibly to his lower extremities and right upper extremities, but I do not feel this will be of sufficient severity to cause an appreciable degree of discomfort."

His recommended treatment for plaintiff's cervical spine was traction, which gives relief in about 60 percent of the cases with little probability of recurrence, and for plaintiff's lower spine, a laminectomy, stating no fusion of the joints was necessary. The reasonable costs of the laminectomy would approximate $300, and the costs of

hospitalization would be $200 to $250 each for the laminectomy and traction.

Dr. Donald S. Miller, an orthopedic surgeon who examined plaintiff at his office in Chicago on March 4, 1952, testified that x-rays of plaintiff's lumbar spine and pelvis showed the following: There were no fractures or dislocations. A mild to moderate degree of scoliosis, curvature, of the lumbar spine, which might be associated with muscle rigidity. A spina bifida; that is, a failure of union in the first sacral process of the spine, present at birth, congenital. A minimal osteoarthritis, irregularity of the bones and joints, of the fifth lumbar and roughening of the joint space between the fifth lumbar and first sacral vertebra, with a very narrow lumbo sacral disc, causing nerve root irritation. He stated there was a severe degree of rigidity to plaintiff's spine; spasm of the left muscles supporting the back of plaintiff's neck and shoulder and of the strap muscles of plaintiff's back; that there was difficulty in completely extending the hip joint with the spine in an erect position, and that the test for leg pains showed positive for plaintiff's right leg and negative for his left leg.

He was of the opinion plaintiff's condition was progressive, considering he had a congenital structurally weak spine, mild arthritis, narrowing of the lumbar sacral joint with nerve root irritation, and curvature of the spine; and that plaintiff's condition "might or could be caused by injury"; and "could or might be permanent."

Plaintiff sprained his left ankle February 13, 1951, when he stepped off of a curb and on April 10, 1951, chipped the bone of his left ankle when the top north step, which had rotted, at the station gave way when he stepped on it. We do not develop these occurrences as our statement of the facts discloses that plaintiff made a submissible case on his fall of January 1, 1952.

■ While Dr. Charles G. Blauw, defendant's witness, was on the stand plaintiff's counsel had him demonstrate a neurological examination with plaintiff as the subject. ■ Later, over defendant's objections, plaintiff's counsel, after showing a surgeon's scalpel to Dr. Blauw and having him identify it, asked the witness to "stand up here" and demonstrate to the jury how an operation to excise the "nucleus pulposus" was performed; and, in answer to questions propounded, Dr. Blauw demonstrated where the incision would be made, its length (indicating) and depth, about two inches, et cetera. Dr. Rollo B. Wray was defendant's next witness, and plaintiff's counsel had him stand before the jury and again demonstrate how to perform the laminectomy.

Plaintiff says defendant may not complain of this evidence because no mention of the alleged error was made in defendant's motion for new trial. At the trial the defendant entered a timely objection (when counsel exhibited the scalpel to the witness and asked him to demonstrate the laminectomy) for the reason "it is highly improper and

prejudicial." Defendant's motion for new trial assigned error in general terms against the admission of incompetent testimony "on behalf of plaintiff over the objections of defendant," and error on grounds the verdict was grossly excessive and the result of prejudice against defendant and sympathy for plaintiff. A general specification of error in a motion for new trial is sufficient under Supreme Court Rule 3.23 (RSMo 1949, p. 4112) where definite objections are interposed during the trial. Foley v. Coca-Cola Bottling Co., Mo. App., 215 S. W. 2d 314, 318; Wampler v. Atchison, T. & S. F. R. Co., 269 Mo. 464, 190 S. W. 908, 912; Chawkley v. Wabash R. Co., 317 Mo. 782, 297 S. W. 20, 30[24]; State v. Baldwin, 317 Mo. 759, 297 S. W. 10, 11(I); 2 Carr, Civ. Proc., § 852 (pocket part). We hold defendant's assignment sufficient to embrace the questioned testimony although it might well have been more specifically worded.

Exhibitions of a plaintiff's injuries or demonstrations of how the injured member functions or fails to function ordinarily rests largely with the exercise of a sound discretion by the trial court. Smith v. Thompson, 346 Mo. 502, 142 S. W. 2d 70, 74; Browne v. Creek, 357 Mo. 576, 209 S. W. 2d 900, 906[14]; Petty v. Kansas City Pub. Serv. Co., 354 Mo. 823, 191 S. W. 2d 653, 658 [13, 14]. In the Smith case reversible error was considered to have not resulted for the reasons no wounds or deformities had been disclosed; the plaintiff acted and answered composedly, without any exclamations of pain; there was little or no chance for malingering, and there was no claim the verdict was excessive; but the court stated it was not "approving the practice except where necessary and safeguarded." The Browne case is to like effect. Such exhibitions and demonstrations have been considered improper when designed to arouse antipathy toward a defendant or sympathy for a plaintiff, or where there is no disputed fact issue. 32 C. J. S. 454, §§ 602, 610; 20 Am. Jur. 606, § 724. In Willis v. City of Browning, 161 Mo. App. 461, 464, 143 S. W. 516, 517, Ellison, J., in remanding a case because plaintiff was permitted to demonstrate her ability to walk, said: "A defendant in an action for damages for personal injury suffers many unavoidable disadvantages, which makes it only the more necessary to shield him from those which may be avoided. The maimed, the widow and the orphan draw strongly enough on the hearts of jurymen without affirmative effort to arouse sympathy. Human nature needs no artificial aid in this respect." Riepe v. Green, Mo. App., 65 S. W. 2d 667, 668[2]; and see the observations in Happy v. Walz, Mo. App., 244 S. W. 2d 380, 383[2].

Defendant argues that the purpose of the demonstration was to arouse the sympathy of the jury for plaintiff and that the verdict and judgment of $40,179 demonstrates it had this result. The instant record presented no controverted fact issue regarding the performance of a laminectomy, and we think there was no sufficient reason for

dramatizing a laminectomy before the jury. Plaintiff returned to work 17 days after his injury and continued to perform his duties for over 5 months, losing only 4 days time. He made little or no effort to mitigate his damages. Dr. Hayne was of the opinion he would not be incapacitated from doing the work he ordinarily performed and that the permanent disability of the affected parts would be 20 to 30 percent. For these and other reasons defendant's position appears to be well taken under the instant record. We cannot approximate the effect of the demonstration upon the amount of the verdict and may not remedy the situation by remittitur.

The judgment should be reversed and the cause remanded. It is so ordered. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.