Latonya LESTER, et al., Respondents,

v.

Mark T. SAYLES and McHenry Truck
Equipment, Inc., Appellants.

No. 74719.

Supreme Court of Missouri,
En Banc.

March 23, 1993.

As modified April 20, 1993.

860

Gary P. Paul, Clayton, for appellants.

Roy A. Walther, III, Myron S. Zwibelman, David S. Slavkin, Elizabeth E. Carver, St. Louis, for respondents.

---

LIMBAUGH, Judge.

This is an appeal from jury verdicts entered in favor of Latonya Lester and her mother, Wanda Thompson, following an accident in which Latonya, then age four years and nine months, was struck by a truck and severely injured. The Court of Appeals, Eastern District, transferred the case to this Court after opinion. Because one of the issues involves the validity of a statute, this Court has jurisdiction of the entire case. Art. V, § 3, Mo. Const.[1] The judgment in favor of Latonya Lester is reversed and remanded for a new trial. The judgment in favor of Wanda Thompson is affirmed.

## BACKGROUND

Latonya sustained injuries on the afternoon of Monday, June 20, 1988, just after 2:00 p.m., when she was hit by a one-ton flat-bed truck owned by defendant McHenry Truck Equipment Inc. and operated by defendant-employee Mark Sayles.

Plaintiffs, Wanda Thompson and her daughter Latonya Lester, lived with their family in an apartment on the south side of St. Louis Avenue near the intersection of St. Louis Avenue and Elliot Street in the City of St. Louis. St. Louis Avenue is a four-lane through street with parking on each side. A fire hydrant is located on the southwest corner of the intersection, approximately 45 feet east of the doorway entrance to the apartment. Earlier in the afternoon, someone had opened this hydrant, apparently seeking respite from the afternoon heat.

A powerful flow of water, surrounded by spray and mist, gushed from the hydrant to a distance nearly half way across St. Louis Avenue. The water then spilled over into the westbound lane of traffic and meandered to the far side of the avenue where a clogged storm drain along the curb was converted to a temporary wading pool. About 2:00 p.m., Wanda crossed the street with her two-year-old nephew so that he could play in the makeshift pool, but she

---

1. Technically, the court of appeals should have transferred the case to this Court *without* opin-ion. Art. V, § 11, Mo. Const.

left her daughter, Latonya, at the doorway playing with their dog.

A few moments later, defendant Sayles, who had just made a delivery and was returning to the company offices, was traveling west on the inside westbound lane of St. Louis Avenue approaching the intersection at Elliot Street. He testified that he observed the spray of water from the hydrant as well as a number of children and adults on the sidewalk nearby, and at that point, he slowed the truck considerably. Latonya had apparently been crossing the street as the truck went through the intersection and the wet pavement. She was hit broadside, swept underneath, and run over. Sayles testified that he never saw Latonya and that he stopped the truck only because he heard a "thud" and realized he had hit something. At trial, the testimony regarding the speed of the vehicle at the time of the accident was grossly inconsistent. Some of the several witnesses stated that the truck had slowed down to as little as 5 m.p.h.; others testified that the truck was traveling at as fast as 30 to 35 m.p.h.

Latonya now suffers from substantial and irreparable injuries. She is a spastic quadriplegic; she cannot walk, crawl or reach out; she will be committed to a wheelchair for the rest of her life and will require lifelong physical care. In addition, brain damage has left her with the mental capabilities of a two-year-old. She will never be able to function independently, much less support herself by working. Her mother, Wanda, is her full-time caretaker.

The jury returned a verdict in favor of Latonya and against Sayles and McHenry Truck Equipment in the amount of $19,-817,000. Wanda Thompson's damages on her claims for medical expenses and for loss of Latonya's "services, society and companionship" were assessed at $1,860,-000. However, the jury found Wanda to be ten percent at fault; accordingly, the court reduced the award to $1,674,000. The trial court also awarded $1,696,240.75 in prejudgment interest pursuant to § *408.040.2, RSMo Supp.1992.* Following the denial of their motions for judgment notwithstand-ing the verdict or in the alternative for new trial, defendants appeal.

## ISSUES PRESENTED

The defendants pose the following points of error:

(1) The trial court committed prejudicial error in allowing the jury to view during its deliberations an exhibit detailing plaintiffs' assessment of Latonya's damages when the exhibit had not been entered into evidence.

(2) The trial court erred in granting plaintiffs' request for prejudgment interest.

(3) The trial court erred in denying defendants leave to amend their answer to allege the comparative fault of Latonya Lester and also erred in refusing to submit a comparative fault instruction on that issue.

(4) The trial court erred in allowing Wanda Thompson to demonstrate during trial the physical therapy techniques she uses on Latonya.

(5) The trial court erred in denying defendants' motion for remittitur.

(6) The trial court erred in denying defendants' motion for a new trial in that the verdicts were the result of bias, passion and prejudice on the part of the jury and were grossly excessive so as to shock the conscience.

(7) The trial court erred in excusing an eighty-year-old juror for allegedly sleeping during the presentation of evidence because it was established that the juror did, in fact, hear and appreciate the proceedings.

(8) The trial court erred in not granting a judgment notwithstanding the verdict because plaintiffs failed to make a submissible case for the negligence of defendant Sayles.

We rule issues (1) and (3) in favor of defendants and against plaintiff Latonya Lester. Both the damages and the liability components of her verdict were the result of reversible error; therefore, her claims are remanded for new trial.

There was no reversible error, however, in the proceedings brought by Wanda Thompson, and her judgment is affirmed.

Because issues (1) and (3) are dispositive of the appeal of Latonya's judgment, we will address them first. We address the remaining issues according to the chronology of the trial and only as they relate to the appeal of Wanda Thompson's judgment.

### THE DAMAGES EXHIBIT

Defendants' first point is that the trial court committed reversible error in allowing the jury to examine during its deliberations a 40″ by 60″ chart which displayed the "high" and "low" range for each of the various items of damage suffered by Latonya. This chart, captioned "LATONYA LESTER DAMAGES," included amounts for loss of income, past pain and suffering, future health care, future major expenses, and future pain and suffering. Total damages on the "low" side were listed as $11,-408,000; on the "high" side, $19,817,000. Plaintiffs' counsel placed the damages chart on an easel in full view of the jury during closing arguments and referred to it several times without objection.

The jury, thirty-five minutes into its deliberations, requested "the chart counsel for plaintiff referred to in closing argument with the sums for pain and suffering of Latonya." Plaintiffs' attorney asked that the request be honored, but defendants objected on the basis that the chart 1) improperly emphasized specific damage awards sought by plaintiff during closing arguments, and 2) had not been properly marked and introduced as evidence. The trial court overruled the objection, marked the chart as Plaintiffs' Exhibit 59, and sent it to the jury room. Fifty-five minutes later, the jury returned its verdict for Latonya Lester in the amount of $19,817,-000—the exact figure listed on the chart as the "high" total damage award.

At common law, the jury was not allowed to take exhibits to the jury room during deliberations, *Eller v. Crowell*, 238 S.W.2d 310, 313 (Mo.1951), and to this day, "it is improper and erroneous to allow the jury to have articles not properly in evidence which would tend to influence the verdict." *Zagarri v. Nichols*, 429 S.W.2d 758, 761 (Mo.1968); *Southwick v. Ace Auto Body Shop, Inc.*, 646 S.W.2d 401, 404 (Mo. App.1983). However, the common law proscription has been modified and relaxed by modern decisions that give the trial judge discretion to allow or disallow requests to take to the jury room those exhibits that have been properly admitted in evidence. This discretion may be invoked even for articles admitted in evidence merely to illustrate or explain the testimony of witnesses. *Zagarri*, 429 S.W.2d at 761.

The application of the general rule prohibiting the jury from reviewing unadmitted exhibits is well illustrated in *Southwick, supra,* involving a dispute over the repair of an automobile. During the deliberations in that case, the jury was given a written "repair estimate," only a part of which had been introduced in evidence and the balance of which consisted of the inadmissible "opinion" of a witness. The trial court committed reversible error because the "opinion" portion of the exhibit was not redacted, and thus, the jury was allowed to consider "opinions" that were not part of the evidence.

Plaintiffs cite *Wilkins v. Cash Register Service Co.*, 518 S.W.2d 736, 751 (Mo.App. 1975), for the proposition that an exhibit that is marked, testified to, and displayed to the jury during the presentation of the evidence becomes as much a part of the evidence as if the proffering party had formally introduced it. *See also, Waters v. Barbe*, 812 S.W.2d 753, 759 (Mo.App.1991); *Missouri Commercial Investment Co. v. Employers Mutual Casualty Co.*, 680 S.W.2d 397, 400 (Mo.App.1984). Although the court in *Wilkins* determined that either party could use the exhibit during closing argument, no effort was made to send the exhibit to the jury during its deliberations. In our view, because the exhibit had been constructively admitted as part of the evidence, the trial court would have had discretion to allow the exhibit to go to the jury.

This is not to say, however, that courts may authorize the juries to view unadmitted evidence. Articles or exhibits which are neither formally introduced nor constructively introduced are not evidence, and they should never be subject to inspection in the jury room. In these instances, the trial judge has no discretion. We have found no case to the contrary.

The damage chart in this case was never entered in evidence, nor would it have been proper to do so. It was used by plaintiffs' counsel only during the closing argument and, as indicated, was marked as an exhibit only after the jury made its request. The objectionable portion of the damage chart consists of plaintiffs' counsel's graphic calculations for past and future pain and suffering in amounts that range from a "low" estimate of $7,020,000 to a "high" estimate of $14,040,000. We recognize that evidence of dollar amounts for pain and suffering damages is inadmissible and that dollar amounts may be brought up only in closing argument by the "argumentative suggestion" of counsel. *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291 (Mo. banc 1978). Nonetheless, the calculations on this chart are not evidence; they are nothing more than the opinions and argument of counsel. Therefore, submission of the exhibit was error.

Our concern is not only that jurors may devote their attention to the force of counsel's argument rather than the probative value of the evidence, but also that the jury might mistake the opinions and argument for facts proven in evidence. To be sure, the jury is advised from the outset that the evidence in the case may include, *inter alia, exhibits.* MAI 2.01. In this case, when the chart was marked as an exhibit and sent to the jury, it carried the imprimatur of the court, and the implication that its contents were not mere opinion, but authoritative evidence.

Plaintiffs counter that the presence of opinions and argument in their exhibit was not prejudicial because the jurors were instructed under a different section of MAI 2.01 that "neither what is said in opening statements or in closing arguments is to be considered as proof of a fact." Initially, we question the efficaciousness of this instruction because it addresses only "what is *said* . . . in closing arguments" as opposed to what is reduced to writing and submitted as part of an exhibit. Nevertheless, plaintiffs propose that the instruction required the jurors to cull from the exhibit the portions that were argument and consider only the portions that were evidence. In our opinion, however, the instruction is not designed to accommodate this confusing scenario. When the chart was marked as an exhibit and presented by the judge as if it had the status of full-fledged evidence, it was unreasonable and unrealistic, absent additional instructions, to expect jurors to identify and to then disregard the portions that were improperly included.

Plaintiffs contend, alternatively, that defendants suffered no prejudice because the jury properly viewed the chart during the entirety of the closing arguments, immediately before the deliberations. In this and most other cases, it is extremely difficult for either party to establish the presence or absence of actual prejudice, given the time-honored prohibition against the use of juror testimony to impeach a verdict. Therefore, we believe that the party responsible for the error, in this case the plaintiffs, should be charged with a presumption that the error was prejudicial. The only evidence presented on the prejudice issue—the fact that the jury set damages in the exact amount listed on the chart as the "high" total damage award—is certainly consistent with that presumption.

We hold that the trial court committed reversible error when it allowed the jury to have during its deliberations a chart that contained the opinions and argument of counsel.

Plaintiffs are correct, however, in their position that the error did not extend to the verdict and judgment in favor of Wanda Thompson. The chart/exhibit, is entitled "Latonya Lester Damages," and it is clear that the listed damage amounts pertain solely to the damages suffered by Latonya.

## COMPARATIVE FAULT OF LATONYA LESTER

Defendants next raise two interrelated allegations of prejudicial error: 1) the refusal of the trial court to allow defendants to amend their pleadings to allege Latonya Lester's comparative fault and 2) the refusal of the court to submit an instruction that would allow the jury to assess fault against Latonya. Procedurally, the defendants sought leave to file amended answers on the day of trial in order to include the comparative fault of Latonya Lester as a defense. Later, during the instruction conference, defendants sought to have the jury instructed on this same issue. The trial court ruled against defendants in both instances.

These claims of error cannot be addressed until we resolve the underlying issue—whether the fault of Latonya Lester is a question of fact for the jury, or whether Latonya, a child of tender years, is incapable of fault as a matter of law. Only if we resolve this issue in favor of defendants and against Latonya, do we address the particular points raised by defendants.

Furthermore, defendants' allegations have been perfected only as they pertain to the claims of Latonya Lester. The point of error on these issues does refer to the amendments and instructions proposed by defendants, however, in violation of Rule 84.04(d), defendants fail to state why the action of the trial court was erroneous as to Wanda Thompson's claims, and fail to offer citations of authority on the matter. The assessment and application of Latonya's comparative fault to reduce the recovery of co-plaintiff, Wanda Thompson, is an issue that is not only problematic but also separate and distinct from the focus of the point of error—whether fault can be assessed against a child of tender years. Defendants have neither identified nor briefed this separate issue. Under these circumstances, we decline to review the point of error as it purports to apply to Wanda's claim.

### A.

■ Various courses have been charted on the issue of contributory negligence, and now, the issue of comparative fault,[2] and their application to children of tender years. In this area, courts must necessarily balance an appropriate concern that children cannot be expected to conform their conduct to adult standards with a countervailing concern that the general public should not shoulder all liability created by the avoidable carelessness of children.

■ A large number of states resolve this difficulty under the "tender years doctrine," which calls for the establishment of a fixed age below which a child will be conclusively presumed incapable of negligence (or fault). See, e.g., Yarborough v. Berner, 467 S.W.2d 188, 190 (Tex.1971) (below age five); Swindell v. Hellkamp, 242 So.2d 708, 710 (Fla.1970) (below age six).[3]

The most severe line drawing, however, occurs under the so-called "Illinois Rule," recognized in several states. See, e.g., Mort v. Walter, 98 Ill.2d 391, 75 Ill.Dec. 228, 457 N.E.2d 18 (1983); Pino v. Szuch, 185 W.Va. 476, 408 S.E.2d 55, 57 (1991). Derived from biblical and criminal common law antecedents, this rule places an almost mystical importance on the age seven and

---

**2.** Although most of the cases and authorities cited herein address the issue with reference to a child's contributory negligence, they apply equally well with reference to a child's comparative fault. Under the system of contributory negligence or under the system of comparative fault, the jury must decide the same question: whether plaintiff's conduct was in any measure negligent. See Gustafson v. Benda, 661 S.W.2d 11 (Mo. banc 1983).

**3.** W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 31, at 179–82 (5th ed. 1984);

F. Harper, et al., The Law of Torts § 16.8, at 438–60 (2d ed. 1986). Other jurisdictions, while not adopting a specific age, hold that at some undetermined age a child is incapable of negligence as a matter of law. Above this age, the issue is reserved for the jury as a question of fact. See e.g., Christian v. Goodwin, 188 Cal. App.2d 650, 10 Cal.Rptr. 507 (1961) (between age four and five); Taylor v. Armiger, 277 Md. 638, 358 A.2d 883, 889 (1976) (probably below age five).

multiples thereof.[4] It is applied so that a child under seven is incapable of negligence as a matter of law. Children between seven and fourteen are presumed incapable of negligence. Only at age fourteen is a child presumed to possess sufficient mental capability to comprehend and avoid danger. *Pino*, 408 S.E.2d at 58.

In stark contrast to the "Illinois Rule" is the modern trend which rejects fixed and arbitrarily drawn age limits. *See, e.g., Honeycutt by and through Phillips v. City of Wichita*, 247 Kan. 250, 796 P.2d 549, 552 (1990); *Peterson v. Taylor*, 316 N.W.2d 869 (Ia.1982); *Toetschinger v. Ihnot*, 312 Minn. 59, 250 N.W.2d 204 (1977).[5] These jurisdictions hold that the question of contributory negligence of young children is ordinarily a question of fact for the jury to decide. *Honeycutt*, 796 P.2d at 552. A minor's incapacity for negligence may be determined as a matter of law only if the child is so young, or the evidence of incapacity so overwhelming, that reasonable minds could not differ on the matter. *Id.* at 551, *citing Quillian v. Mathews*, 86 Nev. 200, 467 P.2d 111–13 (1970).

Although this approach is not without its critics,[6] it has been cited with favor in *Prosser and Keeton on the Law of Torts:*

> Most courts have attempted to fix a minimum age, below which the child is held to be incapable of all negligence.... Other courts have rejected any such fixed and arbitrary rules of delimitation, and have held that children well under the age of seven can be capable of some negligent conduct. Undoubtedly there is an irreducible minimum, probably in the neighborhood of four years of age, but it arguably ought not to be fixed by rules laid down in advance without regard to

the particular case. As the age decreases, there are simply fewer possibilities of negligence, until finally, at some indeterminate point, there is none at all. *Prosser and Keeton* at 180.

In a series of cases near the turn of the century, this Court adopted in essence what we have described here as the modern trend. *Holmes v. Missouri Pac. Ry. Co.*, 190 Mo. 98, 88 S.W. 623 (banc 1905); *Spillane v. Missouri Pac. Ry. Co.*, 135 Mo. 414, 37 S.W. 198 (1896); *Burger v. Missouri Pac. Ry. Co.*, 112 Mo. 238, 20 S.W. 439 (1892); *accord Berry v. St. Louis M. & S.E.R. Co.*, 214 Mo. 593, 114 S.W. 27 (1908). In *Holmes*, the Court stated that "the question of whether a child is old enough to be held responsible for his conduct, as for contributory negligence, is always a question of fact...." *Holmes*, 88 S.W. at 624–25 (citations omitted).[7] The only exception to this rule is where a child is exceedingly young or where there is otherwise no doubt as to the child's capacity, in which case the trial court will decide the issue as a matter of law. *Id.* When evaluating responsibility for conduct, "no higher degree of care will be expected of [a child] than is usually exercised by persons of similar age, judgment, and experience." *Id.*

Subsequent appellate decisions, however, began to erode the holdings of the *Holmes* era cases. For example, in *Quirk v. Metropolitan Street Ry. Co.*, 200 Mo.App. 585, 210 S.W. 103 (1919), it was held that a seven-year-old child who had jumped from a streetcar could not be contributorily negligent, in part, because of his tender years. *Quirk*, 210 S.W. at 105–06. In *Volz v. City of St. Louis*, 326 Mo. 362, 32 S.W.2d 72 (1930), this Court stated in dicta that "we

---

**4.** *Prosser and Keeton,* § 32, at 180.

**5.** *See also,* Donald Paul Duffala, Annotation, *Modern Trends as to Contributory Negligence of Children,* 32 A.L.R.4th 56 (1984); Duffala, Annotation, *Modern Trends as to Tort Liability of Child of Tender Years,* 27 A.L.R.4th 15 (1984); *Restatement (Second) of Torts* § 283A (1986).

**6.** *See, e.g., Clark v. Circus–Circus, Inc.,* 525 F.2d 1328, 1331–33 (9th Cir.1975) (Hill, J., dissenting); *Pino v. Szuch,* 408 S.E.2d at 58 (the Restatement standard set forth in Section 283A is

"too vague to assist a jury."); *see generally* F. Harper, et al., *The Law of Torts* § 16.8 at 438–60; O. Gray, *The Standard of Care for Children Revisited,* 45 Mo.L.Rev. 597 (1980).

**7.** The *Holmes* Court reversed the judgment of the trial court which had found an eight-year-old boy contributorily negligent as a matter of law. This situation is the "flipside" of a tender years case where a child could not, as a matter of law, be contributorily negligent. The *Holmes* analysis applies equally well in both instances.

deem it advisable to say that it is the general rule that a boy six years of age cannot be guilty of contributory negligence." *Id.* 32 S.W.2d at 74. Similarly, this Court noted, again through dicta, in *Schmidt v. Allen,* 303 S.W.2d 652, 658 (Mo. 1957), that a four-year-old child, struck by a car while attempting to cross a major thoroughfare in St. Louis, could not be contributorily negligent. Because of these and other similar cases, the viability and validity of *Holmes* is called into question.[8]

We believe, however, that the "modern trend," espoused in *Holmes* and adopted early on by this Court, is more sound and more likely to ensure just results. Although jurisdictions which have adopted either the "Illinois Rule" or other arbitrary age distinctions have the advantage of consistency and ease of application, that is also the principal shortcoming of their approach. Positing a predetermined age at which negligence or fault can occur has little basis in reason or logic; one day's difference in age should not serve as the dividing line as to whether or not a child is capable of negligence or fault. *See Toetschinger,* 250 N.W.2d at 211. We prefer a rule that allows for a degree of flexibility in the handling of each case so that a child's negligence or fault is determined in relation to the expectations held for other children in same or similar circumstances.

To summarize, we reaffirm the holding of *Holmes.* The fault of a child should be determined by the fact-finder in each case, based upon that degree of care exercised by children of the same or similar age, judgment, and experience. Only if the child is so young or the evidence of incapacity so overwhelming that reasonable minds could not differ on the issue, should trial courts rule as a matter of law, usually pursuant to a motion for directed verdict, that the child cannot be capable of fault.

### B.

 Having concluded that comparative fault may be assessed against a child of tender years, we must next determine if comparative fault is an affirmative defense that must be pleaded before evidence and instructions may be submitted on the issue. Defendants contend that comparative fault is not an affirmative defense that must be pleaded and that the jury must be given a comparative fault instruction, if supported by the evidence, regardless of the pleadings. We disagree.

In the seminal case of *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), this Court abolished contributory negligence as a complete bar to a plaintiff's recovery in negligence cases and appended the Uniform Comparative Fault Act (UCFA) to the opinion with directions that the doctrine of comparative fault as set out in the UCFA be applied to all future cases, "insofar as possible." *Id.* at 15. Section 2(a) of the Act provides:

> In all actions involving fault of more than one party to the action ... the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories [comparative fault instructions] ... indicating ...
>
> (2) [T]he percentage of the total fault of all of the parties to each claim....

As we understand defendants' position, the words "shall instruct the jury" mandate a comparative fault instruction if the evidence in a case shows that fault may be attributed to more than one party to the action. Generally, we agree with that interpretation. However, defendants also read into this language an implication that the comparative fault instruction must be given regardless of whether comparative fault was actually pled. In our view, there is no such implication, and the UCFA does not in any way speak to that question.

Defendants also cite *Earll v. Consolidated Aluminum Corp.,* 714 S.W.2d 932 (Mo. App.1986), in which the court of appeals stated:

---

**8.** Missouri courts continued to follow *Holmes* and its progeny in those cases involving older children. *See, e.g., Carter v. Boys' Club of Greater Kansas City,* 552 S.W.2d 327, 332–33 (Mo.App. 1977) (age 12); *Wilson v. White,* 272 S.W.2d 1, 6–7 (Mo.App.1954) (age 13). Only in cases involving children of tender years and then only in dicta did this Court depart from the rule established near the turn of the century.

[W]e believe that, in a negligence case, where there is evidence from which a jury could find that plaintiff's conduct was a contributing cause of his damages, unless the parties agree otherwise, the case should be submitted to the jury under the instructions and verdict forms approved by the Supreme Court for use in comparative fault cases *regardless of whether the defendant submits an affirmative defense instruction or not.*

*Id.* at 937. (emphasis added). The defendants in *Earll,* however, had, indeed, pleaded comparative fault as an affirmative defense. Moreover, the case was tried and evidence was introduced under the assumption that comparative fault was applicable. At the close of the evidence, though, defendant chose not to tender a comparative fault instruction. The plaintiffs responded by proffering a comparative fault instruction of their own which was refused. The court of appeals held that the trial court's refusal to give the instruction was error; once the issue of comparative fault was in the case, neither party should be allowed to unilaterally deprive the other party of the opportunity to give a comparative fault instruction.[9] When the cited quotation is considered in its full context, it has no relation to the question at hand—whether comparative fault must be pled as an affirmative defense.

■ We hold that comparative fault instructions may be given only where comparative fault has been raised in the pleadings as an affirmative defense. In arriving at this conclusion, we rely on *Rule 55.08* which provides in pertinent part: "in pleading to a preceding pleading, a party shall set forth affirmatively ... contributory

negligence ... and any other matter constituting an avoidance or affirmative defense." The key phrase "any other matter" indicates that the list of affirmative defenses is not exhaustive or exclusive. Under an almost identical federal rule,[10] this language has been interpreted to include a duty to plead comparative fault. *Marino v. Otis Engineering Corp.,* 839 F.2d 1404 (10th Cir.1988). A number of state jurisdictions have also followed suit.[11]

In our view, a plaintiff's comparative fault is a defense to defendant's liability just as contributory negligence, prior to *Gustafson,* was a defense to defendant's liability. The commonality is that both concepts recognize that the liability of the defendant can be negated by the fault of the plaintiff. Although we acknowledge that comparative fault was designed to apportion fault rather than to operate as a complete defense, the obligation to plead affirmative defenses ought not be limited to complete defenses. *See* C. Wright & A. Miller, *Federal Practice and Procedure,* § 1273, at 453 (5th Ed.1990).

In this ruling, we also note that the recently published proposed changes to the Rules of Civil Procedure include an amendment to *Rule 55.08* so that it states expressly that comparative fault is an affirmative defense.

■ One exception to the rule that comparative fault must be pled as an affirmative defense is where, under *Rule 55.33(b),* issues such as comparative fault "are tried by express or implied consent of the parties." In these cases, the issues of comparative fault "shall be treated in all respects as if they had been raised in the plead-

---

**9.** This portion of the court of appeals opinion is actually dicta. At trial, plaintiffs relied solely on a theory of strict products liability, a theory to which the doctrine of comparative fault did not apply at the time. *See Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 491 (Mo. banc 1986). Subsequent to *Lippard* the legislature enacted § 537.765.1, RSMo Supp.1982, which states, "The doctrine of comparative fault *shall* apply to products liability claims. ..."

**10.** Federal Rule 8(c) is exactly the same except that it does not include the defense of "truth in defamation."

**11.** *See, e.g., McGraw v. Sanders Co. Plumbing & Heating, Inc.,* 233 Kan. 766, 667 P.2d 289, 295 (1983); *Jefferson v. Pinson,* 219 Miss. 427, 69 So.2d 234, 238 (1954). Our research has uncovered only one jurisdiction which does not require that comparative fault be affirmatively pled. *Jones v. Cloud,* 119 Ga.App. 697, 168 S.E.2d 598 (1969). However, the Court in *Jones* noted that the affirmative defense statute in Georgia omits any reference to either comparative fault or contributory negligence. *Id.* 168 S.E.2d at 603 n. 2.

ings." In this case, however, it is clear that there was no express or implied consent, even though evidence was presented to the effect that Latonya was admonished many times by her mother to be very cautious and careful when crossing the street. This evidence was admitted solely on the issue of the mother's comparative fault in her separate claim against plaintiffs. It is well settled that evidence will give rise to an amendment of pleadings by implied consent only when it bears solely on the proposed new issue and is not relevant to some other issue already in the case. *Associate Engineering Co. v. Webbe*, 795 S.W.2d 606, 610 (Mo.App.1990); *Racine v. Glendale Shooting Club, Inc.*, 755 S.W.2d 369, 373 (Mo.App.1988).

### C.

■ Having determined that comparative fault must be pled as an affirmative defense, we come to the exact points raised by defendants: whether the trial court erred by denying defendants' request for leave to amend their answer to plead Latonya's fault, and whether the court erred in refusing an instruction to allow the jury to assess that fault. No record was made of the proceedings in which defendants' motion for leave to amend was presented. The legal file discloses only that defendants' written motion was filed with the court on the first day of trial (we assume in pretrial conference) and was subsequently denied by the trial court. There is no indication that plaintiffs specified any grounds for an objection to the proposed amendment, or that they registered any objection at all; nor is there any statement of the trial court's reasons for denying the motion. In all likelihood, the trial court, not having the benefit of our decision rejecting the "tender years doctrine," refused to allow the amendment because of a belief that Latonya, age four years and nine months, could not, as a matter of law, be found to be at fault. The denial of the motion on this sole ground was error.

■ It is conceivable, however, that the proposed amendment was rejected for the separate reason that it was untimely filed. Day-of-trial amendments are permitted only by leave of court, but "leave shall be freely given when justice so requires." *Rule 55.33(a)*. Under this rule, the decision to allow or disallow amendments to pleadings is within the sound discretion of the trial court. *Hospital Development Corp. v. Park Lane Land Co.*, 813 S.W.2d 904, 907 (Mo.App.1991); *Baker v. City of Kansas City*, 671 S.W.2d 325, 329 (Mo.App. 1984). Factors to consider in the exercise of that discretion include:

(1) the hardship to the moving party if leave to amend is denied;

(2) the reasons for the moving party's failure to include the matter in the original pleadings; and

(3) the injustice to the nonmoving party should leave to amend be granted.

*Hospital Development Corp.* 813 S.W.2d at 907.

Plaintiffs do not challenge defendants' showing on the first two factors. Denial of leave to amend caused obvious hardship to defendants because they were not able to avail themselves of the defense of comparative fault and secure an instruction on that point of law. Furthermore, defendants' tenable position that no comparative fault pleading was required tends to excuse the failure to file an earlier amendment.

Plaintiffs focus, instead, on the last factor of "injustice to the non-moving party," which is essentially a rule of prejudice. However, plaintiffs point to no specific injustice and argue nothing more than that they would have been "sandbagged" had the new defense been allowed. Defendants' amendment, offered solely to establish a new legal theory of defense, did not submit any allegations of fact that had not already been fully explored through the parties' extensive discovery efforts. Even though Latonya's contributory fault would not have been relevant under the tender years doctrine, it is inconceivable that plaintiffs would not have evaluated her causal participation in the accident. Indeed, it is difficult to imagine what additional discovery or other preparation plaintiffs might have undertaken to fend off the proposed defense. In this situation, plain-

tiffs could not have been prejudiced. In the improbable event that the trial judge denied the motion for leave to amend because it was untimely filed, there was an abuse of discretion.

We hold that the amendment should have been allowed and the instruction should have been given.

## DEMONSTRATION OF PHYSICAL THERAPY

■ Defendants contend that the court committed prejudicial error by allowing Wanda Thompson to demonstrate the physical therapy that she performs on her daughter. The demonstration consisted primarily of a manipulation of Latonya's limbs. Generally, exhibition of a plaintiff's injury is highly relevant; because the defendant is alleged to have caused injury to the plaintiff, the jury should be able to see the extent of the injuries. *Deveney v. Smith*, 812 S.W.2d 810, 814 (Mo.App.1991). Exhibitions of injury are not improper unless designed to arouse antipathy for the defendant, sympathy for the plaintiff, or where they are irrelevant to any issue in dispute. *Id.* The allowance of an exhibition or demonstration of how an injured member functions or fails to function is largely within the discretion of the trial court. *Taylor v. Kansas City Southern Railroad Co.*, 364 Mo. 693, 266 S.W.2d 732, 736 (1954).

■ Defendants correctly note that eliciting cries of pain or pitiful attempts at locomotion are condemned because they seek to dramatize an injury in an attempt to provoke sympathy and antipathy in the jury. *Fravel v. Burlington Northern Railroad*, 671 S.W.2d 339, 342 (Mo.App. 1984). However, defendants do not allege that Latonya appeared to be in pain or that her movements were "pitiful attempts at locomotion." Nor does the record reflect that she grimaced or cried out in pain. We should not entertain an appeal based on inference that such acts occurred. *Id.*

The demonstration of physical therapy illustrated Latonya's limited ability to interact with Wanda in the way in which she was previously able, and therefore, it was relevant on the issue of Wanda's damages for loss of services, society and companionship of her daughter. Additionally, the demonstration was relevant to the claims for medical damages because it tended to prove the need for physical therapy. The trial court was within its discretion to allow the demonstration.

## THE SLEEPING JUROR

■ Appellants allege that the removal of an eighty-year-old juror at the conclusion of the evidence was improper because the removal was based solely on the juror's advanced age. The trial judge had found that the juror had slept through different intervals throughout the trial. He noted at least twelve distinct times when she closed her eyes for periods of several minutes or more and noted at least five times when she had both closed her eyes and dropped her head to her chest. On plaintiffs' motion, the juror was removed from the panel and replaced with an alternate juror. Defendants contend that the juror had shown during voir dire that she could listen with her eyes closed and that the trial court should have held a hearing before dismissing her.

■ It is within the discretion of the trial court to dismiss a juror who has slept through the presentation of evidence. *State v. Whitman*, 788 S.W.2d 328, 337 (Mo.App.1990); *State v. Youngblood*, 648 S.W.2d 182, 188 (Mo.App.1983). The trial court is in the best position to determine whether a juror will be able to effectively discharge her duties. *State v. Cook*, 782 S.W.2d 762, 763 (Mo.App.1989). There is no requirement that the trial court should have held a hearing to determine whether to dismiss the juror. Because it is clear from the record that the trial court dismissed the juror for napping, there is no substance to defendants' allegation that the trial court dismissed the juror solely on account of her age.

## SUBMISSIBILITY

■ Next, defendants raise the issue of submissibility. Plaintiffs instructed on the

specific allegations that defendant Sayles was negligent by failing to keep a careful lookout and by driving at an excessive speed. In considering the question of submissibility, we review all evidence in the light most favorable to plaintiff, giving plaintiff the benefit of all reasonable inferences. *Foster v. Farmers Ins. Co.,* 775 S.W.2d 143, 144 (Mo. banc 1989).

 To make a submissible case for failure to keep a careful lookout, Wanda and Latonya must have presented substantial evidence from which the jury could find that Sayles, by keeping a careful lookout, could have seen Latonya in time to avoid the accident. *Id.* On the issue of excessive speed, Wanda and Latonya must have introduced evidence that the speed of the truck was excessive notwithstanding the speed limit "in view of the surrounding facts, conditions and circumstances of which defendant had actual or implied knowledge." *Hill v. Boling,* 523 S.W.2d 867, 870 (Mo.App.1975) *quoting Bear v. Devore,* 176 S.W.2d 862 (Mo.App.1944).

By Sayles' own admission, he was aware as he approached the intersection that a number of children were playing in the water around the fire hydrant. Additionally, the jury viewed a videotape of the intersection, from the vantage point of the defendant and with the hydrant turned on full force, and from the video, the jurors could have inferred that Sayles should have been able to see Latonya when he passed the fire hydrant, 44 feet from the site of the accident. Furthermore, plaintiffs called an accident reconstruction expert who testified about the reaction time and stopping distance of a vehicle on a wet street at various speeds. He concluded that, if the truck were traveling at 5 m.p.h. on the wet street, the stopping distance from the time the driver should have been aware of the possibility of the accident, would be 13.75 feet. Moreover, he testified that if the vehicle were traveling at 30 m.p.h., the stopping distance would be 143.5 feet. Had Sayles been driving 5 m.p.h. as he claimed, or some other reasonable speed, the jury could find that he should have seen Latonya and taken precautionary action. This evidence is sufficient to support the submission of either theory of negligence.

## REMITTITUR AND EXCESSIVE VERDICT CLAIMS

 Defendants' next point is that the trial court erred in failing to enter an order of remittitur reducing the damages which the jury assessed in favor of Wanda Thompson. The verdict was for $1,860,000. Because the jury found Wanda to be 10% at fault, the trial court properly reduced the award by 10% to $1,674,000. Defendants claim that the award exceeds reasonable compensation and is punitive.

Under § *537.068, RSMo Supp.1982,* enacted in 1987, the trial court may order remittitur if, "after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." We agree with the holding of the court of appeals in *Larabee v. Washington,* 793 S.W.2d 357, 359–60 (Mo.App.1990), that review of the trial court's failure to order remittitur under this statute is solely for abuse of discretion.

Wanda Thompson incurred approximately $86,000 in medical expenses for her daughter's treatment, and the evidence indicates that future surgical procedures and therapy will be necessary. Latonya needs full-time care which must be provided by her mother, either personally or financially. Most importantly, Ms. Thompson has been deprived of the enjoyment of her daughter's company, the loss of her services, society and companionship. Given the devastating injuries to Latonya, we do not believe that the jury award exceeded fair and reasonable compensation. There was no abuse of discretion.

 In a related argument, defendants assert trial court error in the denial of their motion for new trial because the verdicts were the result of bias, passion and prejudice on the part of the jurors and were so excessive that they should have shocked the conscience of the court. The amount of

the verdict, however, will not alone establish the passion or prejudice necessary to overturn a verdict. *Larabee*, at 359–60. We have held that the verdict was not so excessive to require remittitur, and for the same reasons, the verdict is not so excessive that it shocks the conscience of the court. Point denied.

## PREJUDGMENT INTEREST

### A.

Defendants' second claim is that the trial court erred in granting plaintiffs' request for prejudgment interest under § *408.040, RSMo Supp.1992.* That statute provides:

1. Interest shall be allowed on all money due upon any judgment or order of any court from the day of rendering the same ... all such judgments and orders ... shall bear nine percent per annum ...

2. In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest, at the rates specified in subsection 1 of this section, shall be calculated from the date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier....

On February 19, 1990, plaintiffs' attorney made a demand for settlement. Subsequently, plaintiff made other offers in which the settlement amount was increased. The body of the original letter to defendants says, in its entirety: "Pursuant to R.S.Mo. Section 408.040(2), I am hereby authorized to settle this lawsuit for $950,-000.00." The offer of settlement, however, made no attempt to separate the claims of Latonya from those of her mother. Although we can assume that this offer was intended to dispose of the claims of both claimants, any attempt to apportion the offer between the two plaintiffs is entirely speculative.

The trial court, noting that defendants had neither rejected the offer nor submitted a counteroffer, calculated prejudgment interest from a date 60 days after the offer was made. Thus, interest accumulated for 305 days, from April 20, 1990, to February 19, 1991, the date of the verdict. Interest was calculated on the combined jury awards of $21,491,000.

### B.

Defendants submit five reasons why the imposition of prejudgment interest was error:

1. The statute deprives defendants of due process of law because defendant is denied a hearing to contest delays in the prosecution of the case, delays that resulted in the imposition of additional interest;

2. The statute deprives defendants of due process of law because it is vague;

3. The statute violates the "open courts" provision of the Missouri Constitution;

4. The statute does not apply to damages for *future* economic and *future* non-economic damages;

5. Interest was computed based on the plaintiffs' original offer of settlement instead of the last offer of settlement.

The first three issues involve constitutional challenges against the statute and are, therefore, subject to special rules of review. First, a statute is presumed to be constitutional and will not be held to be unconstitutional unless it clearly and undoubtedly contravenes the constitution. *Adams v. Children's Mercy Hosp.,* 832 S.W.2d 898, 903 (Mo. banc 1992). Moreover, a statute will be enforced by the courts unless it plainly and palpably affronts fundamental law embodied in the constitution. *Id.; see also, Blaske v. Smith & Entzeroth, Inc.,* 821 S.W.2d 822, 828 (Mo. banc 1991). Finally, the burden of proof is on the party claiming that the statute is unconstitutional. *Adams,* 832 S.W.2d at 903.

### 1.

Under *§ 408.040*, interest accrues from the date sixty days after a demand for payment or an offer to settle is made, or from the date the demand or offer was rejected without counter offer, whichever is the earlier—until the date of final judgment. Interest accrues even though plaintiffs may delay the prosecution of the case. As defendants contend "the statute allows plaintiffs to penalize defendants by the addition of a premium to the judgment for delay occasioned solely by plaintiffs' own action or inaction." Defendants then argue that they are denied due process of law as guaranteed under the United States and Missouri Constitutions because they are not afforded a hearing or other means to contest the delay.

We need not consider the failure of the statute to provide any hearing procedure or other means to contest a delay caused by plaintiff because, in this case, defendants have alleged no delay. Generally, only those adversely affected by a statute have standing to challenge the constitutionality of the statute. *Belton v. Board of Police Comm'rs*, 708 S.W.2d 131, 139 (Mo. banc 1986). From our gratuitous review of the record, the offer of settlement was made approximately one year after the filing of the lawsuit, and from that point on, the case proceeded expeditiously. There was no delay. The point is denied.

### 2.

Defendants also claim a denial of due process of law because the statute is unconstitutionally vague. In particular, defendants allege that the statute 1) fails to indicate whether plaintiffs' written demand should be submitted to the defendants before or after the filing of the lawsuit and 2) fails to articulate the amount upon which prejudgment interest is calculated.

The void-for-vagueness doctrine protects against arbitrary and discriminatory enforcement by ensuring that laws provide explicit standards for those who apply them. *State ex rel. Cook v. Saynes*, 713 S.W.2d 258, 260 (Mo. banc 1986). "If the terms or words used in the statute are of common usage and are understandable by persons of ordinary intelligence, they satisfy the constitutional requirement as to definiteness and certainty." *Prokopf v. Whaley*, 592 S.W.2d 819, 824 (Mo. banc 1980).

Defendants first assert that *§ 408.040* does not clearly express whether the statute may be triggered by a demand made before the filing of the lawsuit or only by demand made after the filing. In our view, there is no ambiguity. The statute, by its plain language, requires no more than plaintiff make "a demand for payment of a claim or an offer of settlement." By placing no limitation on when the plaintiff may make this offer, the legislature has answered the question.

Defendants second claim of vagueness is that the amount on which prejudgment interest is to be assessed cannot be determined from the language of the statute. They suggest there are two possibilities. The first would hold that the assessment should be made on the full amount of the final judgment; the second would require the assessment only on the difference between the final judgment and plaintiffs' offer of settlement. Subsection 1 of the statute states that, "[i]nterest shall be allowed on *all money due* upon any judgment or order of any court from the day of rendering the same until satisfaction be made by payment." (emphasis added). This subsection, standing alone, appears to address only post-judgment interest which the statute clearly allows. However, subsection 2 requires that prejudgment interest be paid only "if the claimant has made a demand for payment ... and the amount of the judgment or order exceeds the demand for payment ..." These subsections when read in harmony eliminate any possible ambiguity or vagueness. The statute tolerates only one interpretation: Prejudgment interest is to be calculated on the entire amount of money due where this amount exceeds the settlement offer.

### 3.

Defendants also claim that the imposition of prejudgment interest operates to deny the constitutional right of access to courts by penalizing a defendant who elects to defend rather than settle a case. Article I, § 14, of the Missouri Constitution provides:

[T]hat the courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character, and that right and justice shall be administered without sale, denial or delay.

We have interpreted this provision as a prohibition of legislative enactments that impose procedural bars to court access. For example, in *State ex rel. Cardinal Glennon Memorial Hosp. v. Gaertner*, 583 S.W.2d 107, 110 (Mo. banc 1979), this Court held that a pretrial procedure requiring a plaintiff in a malpractice case to submit the claim to the Professional Liability Review Board before filing suit constituted an impermissible precondition on the plaintiff's right of access to the courts.

The statute does not create a procedural bar. Although the statute encourages settlement, it does so without eliminating a defendant's right to defend the suit. It is, in fact, defendants' choice whether to accept the offer, submit a counter offer, or, as here, simply ignore the offer. Thus, the imposition of prejudgment interest does not in any fashion implicate the constitutional right to access our courts.

### 4.

Defendants also claim, without citation or authority, that the prejudgment interest statute should not be applied where the bulk of the jury award goes to future economic and future noneconomic damages. They assert that the rationale of the statute—to compensate an injured person for the true cost of money damages—is subverted by an interpretation that would allow plaintiff to recover both future damages and prejudgment interest, and in this way, plaintiffs are overcompensated.

As we have stated earlier, it is clear that prejudgment interest shall be based "on all money due upon any judgment or order." In our view, the statute clearly contemplates the result reached by the trial court.

### 5.

Finally, defendants contend that the trial court erred by using an incorrect date as the starting point from which interest accrues. They suggest that the court should have based its computations on the date of the plaintiffs' last settlement offer. Defendants' theory, however, runs counter to the clear language of the statute which states that prejudgment interest "shall be calculated from a date 60 days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier."

Here, plaintiff made an offer of settlement on February 19, 1990. Defendant took no action. Therefore, prejudgment interest began to run 60 days from that date. Under the statute, it is immaterial whether plaintiff made any subsequent offers of settlement. The trial court did not err.

### C.

As noted at the outset, plaintiffs' offer of settlement did not distinguish between the claims of Latonya and those of her mother. Hence, it is not possible to apportion the $950,000 settlement offer to the separate claims.

Because Wanda Thompson's judgment alone exceeds the amount of the settlement offer, the portion of the offer that was attributable to her claims need not be calculated. We determine that she is entitled to prejudgment interest on the full amount of her judgment. By our calculations, interest due for 305 days at 9% is $125,894.

If, on retrial, Latonya Lester is again awarded judgment that exceeds $950,000, she too will be entitled to prejudgment interest on the full amount of the judgment. It would be premature, however, for us to determine the amount of prejudgment interest, if any, that she would receive on a judgment under $950,000.

## CONCLUSION

The judgment in favor of Latonya Lester is reversed and remanded for new trial. The judgment in favor of Wanda Thompson is affirmed.

BENTON and PRICE, JJ., and ULRICH, Special Judge, concur.

COVINGTON, J., concurs in part and dissents in part in separate opinion filed.

ROBERTSON, C.J., and HOLSTEIN, J., concur in opinion of COVINGTON, J.

THOMAS, J., not sitting.

COVINGTON, Judge, concurring in part and dissenting in part.

I concur in the principal opinion's holding on all points but the first, that which the principal opinion entitles "The Damages Exhibit." Although I agree with the principal opinion that the trial court abused its discretion in permitting the "damages exhibit" to be examined by the jury in its deliberations, I do not find the error to be prejudicial. The principal opinion assumes that the fact that the jury set damages in the exact amount listed on the chart as the "high" total damage award is sufficient to establish prejudice. I respectfully disagree.

The principal opinion lavishly affords presumptions without basis in the law. The exhibit at issue presented in two columns the high estimate *and* the low estimate of the following categories of damages: loss of income; past pain and suffering; future health care; future major expenses; future pain and suffering. The principal opinion presumes that the jury, having seen the damage chart marked as an exhibit, would have taken the exhibit as "authoritative evidence." The principal opinion ignores the fact that the exhibit sets forth the low, as well as the high, estimated damages. The principal opinion impermissibly speculates regarding the use to which the jury may have put the estimates. The principal opinion speculates that the jury failed to follow the instructions and thoughtlessly accepted as evidence the highest damage figure.

The principal opinion's analysis completely disregards the fact that the plaintiffs presented to the jury in closing argument all of the information on the exhibit, all without objection, and that there would have been no basis for objection had one been proffered; nothing impermissible was argued. Furthermore, there was no error in the trial court's allowing counsel to use the chart to argue damages. *See Bower v. Hog Builders, Inc.*, 461 S.W.2d 784, 803–04 (Mo.1970).

The principal opinion loses sight of the underlying premise that the jury is presumed to follow the instructions given by the trial court. *Barlow v. Thornhill*, 537 S.W.2d 412, 422 (Mo. banc 1976). The trial court in this case properly instructed the jury on the issue of damages. This Court should presume that the jury followed the damage instruction. The trial court instructed the jury in this case to consider only the evidence and the reasonable inferences derived from the evidence. MAI 3.01. This Court should presume that the jury followed MAI 3.01. The trial court properly instructed the jury that opening statements and closing arguments were not to be considered as "proof of a fact." MAI 2.01 [1978 revision]. This Court is required to presume that the jury also followed MAI 2.01.

If in their deliberations after closing arguments, the jury determined to compensate plaintiffs at the highest estimate suggested during the closing argument, having followed the court's instructions, including having considered only the evidence and the reasonable inferences derived from the evidence, the jurors would have acted within their stated responsibilities. If a juror had independently recalled the high estimate from closing argument and the jury used that estimate as its verdict, this Court would not find reversible error. Because the damage chart showed the estimated high *and* low damages and reflected a presumptively error-free closing argument, I see insubstantial differences between the facts of this case and a case in which a juror independently recalled the

high estimate from closing argument and the jury used that estimate as its verdict.

The presumption that the jury followed the instructions given by the trial court outweighs any presumption that the jury viewed the exhibit as "authoritative evidence." I would affirm the trial court on this point.