Janet LUNN, Plaintiff/Appellant,

v.

Scott ANDERSON, M.D., Heather White, M.D., Digestive Disease Specialists, Inc., Esse Health, and SSM Healthcare d/b/a Depaul Health Center, Defendants/Respondents.

No. ED 92395.

Missouri Court of Appeals, Eastern District, Division Four.

Dec. 8, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 21, 2010.

Application for Transfer Denied March 2, 2010.

Leonard P. Cervantes, Jennifer Suttmoeller, Cervantes & Associates, St. Louis, MO, for Appellant.

J. Thaddeus Eckenrode, Eckenrode–Maupin, Clayton, MO, for Respondents, Scott Anderson, M.D. And Esse Health.

David P. Ellington, Brown & James, St. Louis, MO, for Respondents, Heather White, M.D. and Digestive Disease Specialists, Inc.

Rodney M. Sharp, Natalie J. Kussart, Sandberg Phoenix & von Gontard, P.C., St. Louis, MO, for Respondent, SSM Health Care St. Louis d/b/a Depaul Health Care.

KURT S. ODENWALD, Presiding Judge.

### Introduction

Janet Lunn (Plaintiff) appeals from trial court's entry of judgment, following a jury verdict, in favor of Defendants Scott Anderson, M.D., Heather White, M.D., and Digestive Disease Specialists, Inc., in Plaintiff's wrongful death medical malpractice action. On appeal, Plaintiff asserts the trial court erred: 1) in granting summary judgment in favor of defendant SSM

Healthcare d/b/a DePaul Health Center (DePaul) prior to trial; 2) in denying Plaintiff leave to file a first amended petition claiming negligence based upon the use of sequential compression devices; and 3) allowing the jury to review certain evidence during deliberation. We reverse and remand the trial court's entry of summary judgment in favor of DePaul, but affirm the trial court's judgment in all other respects.

### Factual and Procedural Background

Plaintiff, the surviving daughter of John Holzer (Decedent) initiated this wrongful death action on behalf of Decedent's survivors against, among others, Dr. Anderson, Dr. White, Digestive Disease Specialists, Esse Health, and DePaul on December 30, 2005.[1]

### 1. Discovery

The parties engaged in extensive discovery prior to trial. On November 10, 2006, Plaintiff took the deposition of Dr. Anderson, and on January 23, 2007, Plaintiff took the deposition of Dr. White. On January 8, 2008, Plaintiff filed her Supplemental Answers to Interrogatories and designated certain expert witnesses, including Russell Holman, M.D. (Dr. Holman), and Geraldine Breite. RN (Nurse Breite). On June 11, 2008, Defendants took Dr. Holman's deposition. On July 2, 2008, Defendants took the deposition of Nurse Breite. Defendants endorsed their experts in August 2008. Plaintiff took the deposition of Michael Cox, M.D., on September 10, 2008, and the deposition of Neil Ettinger, M.D., on September 18, 2008.

### 2. First Amended Petition

On September 17, 2008, Plaintiff sought leave to file an amended petition containing several new allegations. With regard to the alleged negligence of DePaul, Plaintiff alleged in paragraph 11 of her First Amended Petition that DePaul, through its agents, servants, and employees, was negligent, *inter alia*, because:

> *c. Defendant's nurses failed to question Dr. White or advocate for decedent to Dr. White for the re-ordering and continuance of Lovenox or other anti-coagulant medication after the June 7, 2002 operation; and, or*
>
> *d. Defendant failed to properly use the sequential compression devices on decedent's legs which resulted in bilateral deep venous thrombus formation which required the administration of full dose IV Heparin and Coumadin, which caused or contributed to cause internal bleeding which, in turn, caused or contributed to cause decedent's death."*

DePaul objected to the proposed amendments, stating that Plaintiff had named her expert witnesses in January 2008 and had more than nine months in which to amend her pleadings to conform to the expert's anticipated testimony. DePaul argued that allowing Plaintiff to amend her negligence claim against it three weeks prior to the scheduled trial would cause unnecessary and undue prejudice to DePaul. With regard to the negligence claim against DePaul, the trial court granted Plaintiff's motion for leave to file her amended petition in part, allowing paragraph 11(c), but striking paragraph 11(d).

As modified by the trial court, Plaintiff's First Amended Petition (Petition) alleged

---

1. Other named defendants were dismissed prior to the proceedings below and are not parties to this appeal.

as follows. On May 10, 2002, Decedent was admitted to DePaul for abdominal pain and a small bowel obstruction, and was a patient of the Defendants until his death on June 21, 2002. On May 11, Decedent underwent abdominal surgery to correct the obstruction. Because Decedent was at risk to develop deep venous thrombosis (DVT), he was placed on anticoagulant therapy consisting of subcutaneously administered Heparin and sequential compression devices (SCDs, also referred to as Intermittent Pneumatic Compression or IPCs) applied to his lower extremities. The Heparin was discontinued on May 18, and Decedent was then placed on subcutaneously administered Lovenox.

Thereafter, Dr. White, Decedent's internist and gastroenterologist, in anticipation of a June 7 surgery she scheduled for Decedent to insert a PEG stomach feeding tube, entered an order to "hold" the administration of Lovenox on June 6.

Following the surgery, neither Dr. White nor Dr. Anderson, who was Decedent's attending and primary care physician, entered an order to restart Lovenox or other anti-coagulant medication. As a result, Decedent was not given anti-coagulant medication until June 17, when he was diagnosed with DVT of both legs. On June 17, Decedent was administered full dose IV Heparin drip and Coumadin. These anti-coagulant medicines, ordered on June 17 to treat Decedent's DVT, caused internal bleeding that resulted in Decedent's death on June 21.

Plaintiff alleged DePaul was careless and negligent because it failed to properly dress a central IV line and to use that degree of skill and learning ordinarily utilized by nurses or other health care professionals in inserting a central IV line, and/or to question Dr. White or advocate for Decedent to Dr. White for the re-ordering and continuance of Lovenox or other anti-coagulant medication after the June 7 operation.

Plaintiff alleged Dr. Anderson, Esse Health, Dr. White, and Digestive Disease Specialists were careless and negligent because they failed to restart the administration of Lovenox or other anti-coagulant medication after the Decedent underwent the June 7 surgery, and/or to use that degree of skill and learning ordinarily used by physicians in maintaining anti-coagulation medicines including Lovenox after the surgery.

As to DePaul, Dr. Anderson, and Esse Health, Plaintiff alleged carelessness and negligence in failing to diagnose Decedent's internal hemorrhage prior to his death; to communicate Decedent's signs and symptoms of internal bleeding prior to his death; to respond to numerous requests by nurses and other health care providers to changes in Decedent's medical condition; to use that degree of skill and learning ordinarily used by physicians and nurses in responding to Decedent's change in medical condition; and/or to coordinate Decedent's care by overseeing the re-ordering of Lovenox or other anti-coagulant medication after the June 7 surgery.

Plaintiff asserted that the carelessness and negligence of Defendants in failing to restart Lovenox or other anti-coagulant medication after this surgery resulted in Decedent developing DVT on June 17 that required the administration of full dose IV Heparin and Coumadin, which caused, or contributed to cause, internal bleeding that caused or contributed to the death of Decedent on June 21, 2002.

In addition to striking allegations that DePaul failed to properly use sequential compression devices on Decedent's legs following his surgery from the Petition, the trial court further modified the Petition by striking allegations of negligence involving

the use sequential compression devices in relation to the other defendants, and also removed an allegation that the Defendants' acts of negligence constituted aggravating circumstances attending the death of Decedent, entitling his survivors for additional damages.

### 3. DePaul's Motion for Summary Judgment

On August 22, 2008, DePaul filed a Motion for Summary Judgment. In its Motion for Summary Judgment, DePaul argued that Plaintiff's allegation of negligence as to DePaul was limited to the nurses who tended the Decedent during the initial 48 hours following surgery. Specifically, Plaintiff alleged the nursing staff had an obligation to inquire with Dr. White as to whether Dr. White wanted Decedent's blood thinning agent/anticoagulant, Lovenox, restarted. DePaul contended that Dr. White testified at her deposition that she consciously made a decision to not restart the Lovenox, and that Plaintiff's expert witness acknowledged in her deposition testimony that Dr. White would have declined to restart the Decedent on Lovenox even had the nurses questioned her about restarting the blood thinning agent. Given this testimony, DePaul argued Plaintiff could not make a submissible case on causation against the DePaul nursing staff, and, therefore, DePaul was entitled to summary judgment.

### 4. Plaintiff's Response to DePaul's Motion for Summary Judgment

In her response to DePaul's Motion for Summary Judgment and Statement of Uncontested Facts, Plaintiff denied that her physician expert, Dr. Holman, acknowledged that Dr. White made a conscious decision to not restart Lovenox. Plaintiff further denied that her nursing expert,

Nurse Breite, acknowledged that Dr. White would not have changed the hold order even if the nurses had asked Dr. White about the Lovenox. Plaintiff denied the assertion that no expert had testified to a reasonable degree of medical certainty that DePaul contributed to or caused Decedent's death, and affirmatively stated that Nurse Breite's expert opinion was that the nurses breached the standard of care by failing to advocate for Decedent or to question the doctors regarding the Lovenox. Plaintiff also asserted that Dr. Holman testified that the nurses' actions or failure to act regarding the "hold" order for Lovenox caused or contributed to Decedent's death. Plaintiff also averred that Dr. Holman testified that, in his opinion, a reasonable doctor, if prompted by nurses concerning the discontinuance of Lovenox, would have restarted the Lovenox because Decedent required such anti-coagulant therapy after the June 7 surgery to prevent blood clots in his legs.

Among other exhibits to her response to DePaul's motion for summary judgment, Plaintiff submitted an affidavit subscribed and sworn by Dr. Holman. In this affidavit, Dr. Holman expressed opinions based on reasonable medical certainty, including that "[d]espite Dr. White's explanation in her deposition that she intended to take [Decedent] off the Lovenox permanently, there is nothing in the medical records to indicate that was her intention." Dr. Holman indicated that the DePaul nurses failed to advocate for Decedent to his doctors or to question them regarding the "hold" order for the Lovenox and that he believed this failure caused or contributed to cause Decedent's death. He also attested, "The use of the word 'hold' as used in medical records usually refers to a temporary withholding. If Dr. White intended to permanently 'hold' [Decedent's] Lovenox, the word 'discontinue' or abbreviation 'DC' should have been used in her Order

of June 6, 2002." Dr. Holman also stated, "I believe that a reasonable doctor, if prompted by nurses concerning the discontinuance of Lovenox, would have been expected to reinstitute Lovenox because the patient required such anti-coagulant therapy after the June 7, 2002 surgery to prevent blood clots in his legs."

Plaintiff also submitted Dr. Holman's deposition as an exhibit in response to the motion for summary judgment. In his deposition, Holman stated:

> Just to summarize, it appears that Dr. White, at the time of discontinuing the Lovanox [sic] order, took primary responsibility for anticoagulation that would have related to either atrial fibrillation and/or deep vein thrombosis prophylaxis. I agree that there were no subsequent—there is no subsequent evidence of atrial fibrillation, so that anticoagulation would have been directed to deep vein thrombosis prevention only. And my criticism is that that was not addressed in the medical record and it was not coordinated with Dr. Anderson as the attending physician of record.

Dr. Holman further stated:

> The inference, because it was never restarted, was that there was a conscious effort to withhold that medication indefinitely. And [Dr. White] said so in her deposition, that she consciously held the medication. Speculation may lead you to think that it was an oversight, that it was held and forgotten about.

> That's the use of a—that's the—that's where a deposition may be helpful to supplement what's not in the medical record. I would only speculate, just looking at the medical record, that the Lovanox [sic] was completely forgotten about once it was held because there was no reference to management of deep vein thrombosis prevention subsequent to June 6th.

And so I am inferring through the medical record and through depositions that by stopping the medication and never restarting it, that she took on ownership of the patient's anticoagulation regimen.

Plaintiff also submitted Dr. White's deposition. Dr. White testified that she wrote a hold order on Decedent's Lovenox on June 6 "in anticipation of an invasive procedure where an incision was going to be made and also a scope was going to be passed down through the mouth into the stomach and into the first part of the small intestine as well as the placement of the feeding tube, possibility of doing some biopsies, which were in fact done at the time of the procedure. That was the initial reason for holding the Lovenox. However, there became other reasons to keep the patient off of the Lovenox." When asked how long the Lovenox was to be held, Dr. White replied, "Until it was determined that it was appropriate to resume it." When asked who was supposed to make the decision to resume the Lovenox, Dr. White said, "It could be any physician seeing the patient who deemed that the benefit outweighed the risk." When asked if she had discussed reinstituting the Lovenox with any physician after the June 6 procedure, Dr. White responded, "My communication was through the chart—by not reordering it to resume." Dr. White testified at her deposition that she did not recall specifically discussing not resuming Lovenox with any physician nor did she discuss her decision with Decedent's family. She further testified that she did not document her reason for not resuming Lovenox in Decedent's medical records.

Dr. White testified that she did not restart the Lovenox after the feeding tube was placed:

> Because of an evaluation of risks versus benefits. The original indication for the

Lovenox was paroxysmal atrial fibrillation. The patient had been in sinus rhythm. The cardiologist had already previously noted he was at increased risk for anticoagulation therapy.

The other problems that I noted at that time, at the time of the procedure, number one, I wanted to hold it because he was having an invasive procedure and having an incision made, and I didn't want to have bleeding from the incision or the feeding tube placement.

Number two, he had duodenitis which was documented at the time of the feeding tube placement. That's in my procedure note and as part of the medical record.

Biopsies were taken at that time which subsequently showed gastritis. Obviously that was not—tissue diagnosis wasn't available immediately at the time of the procedure.

And a third factor was that the patient was anemic. His hemoglobin had dropped significantly since he was originally admitted. And all of those things—anemia means a low blood count, which means if you have patients who are at an increased risk for bleeding and you continue an anticoagulant, you have a potential bleeding site, make an incision from a feeding tube placement, and they're already anemic, this man had already had many complications, those things weighed into my decision not to restart the Lovenox.

In response to being asked when she believed that the Lovenox could be restarted safely, Dr. White replied, "When the benefit to resuming it outweighed the risk." Dr. White admitted that she did not order Decedent's original anticoagulant therapy and that, as a gastroenterologist, she generally did not treat conditions for which Lovenox was prescribed.

Plaintiff also submitted Nurse Breite's deposition containing questions asked by DePaul's counsel as an exhibit to her summary judgment response. Nurse Breite acknowledged that, according to Dr. White's deposition testimony, Dr. White made a conscious decision to not restart Decedent's Lovenox. When posed with the question, "So if one of the nurses that was taking care of [Decedent] during the first 48 hours said, hey, Dr. White, do you want me to restart the Lovenox, she would say no, true?" Nurse Breite responded, "But that's not charted in the record anywhere." DePaul's counsel persisted, "But if she made a conscious decision to not restart it—" Nurse Breite then responded, "I can't say that occurred." DePaul's counsel continued, "I'm not asking you to say whether or not it occurred." Nurse Breite replied, "It's not in the record, so I can't say whether or not it did occur."

DePaul's counsel then explained to Nurse Breite that he was posing a hypothetical and again asked Nurse Breite if Dr. White had stated in her deposition that she made a conscious decision to not restart the Lovenox, to which Nurse Breite answered, "True." He then asked, "And we have no other testimony to the contrary, true?" Nurse Breite answered, "True." DePaul's counsel then asked, "So if a nurse during that first 48–hour period had approached Dr. White and said hey, what do you want to do about this Lovenox, she had made a conscious decision to not restart it. She would have said no." Nurse Breite answered, "According to her deposition." Plaintiff also submitted the deposition of Defendant's expert Philip Ludbrook, M.D., and the deposition of Dr. Anderson. Dr. Ludbrook testified that there was nothing in Decedent's medical records to indicate whether Dr. White meant to "hold" the Lovenox temporarily, or discontinue it indefinitely, nor was there anything in the records to indicate that Dr.

White made a conscious decision to permanently withhold the Lovenox following the June 7 surgery, or that she made a risk/benefit analysis regarding its resumption. Dr. Anderson testified that "discontinuing" a medication means to stop it completely and that it is no longer on the record, and that to "hold" a medication leaves open the possibility that it is to be restarted at some time in the future. He stated that he did not know why Dr. White did not restart the Lovenox after the June 6 procedure, although it was in her power to do so.

The trial court granted summary judgment in favor of DePaul on September 30, 2008.

5. *Facts Relating to Non–Summary Judgment Issues on Appeal*

As pertinent to other issues on appeal, the following occurred during Plaintiff's jury trial, which was conducted October 6 through 8, 2008.

### A. Sequential Compression Devices

Sequential compression devices (SCDs) are inflatable sleeves, connected to an air pump, that are attached around a patient's legs to improve blood flow. Plaintiff, who is a licensed practical nurse, and other family members testified that they rarely saw SCDs in use on Decedent between June 7 and June 17. Dr. Holman testified that SCDs must be used regularly in order to be effective, and stated that the nurses' notes indicated there were four days where the SCDs did not appear to be used at all, and that the documentation for other dates was intermittent, indicating only occasional use on those days. Dr. Holman stated that with such intermittent use, he could never rely on the devices to be effective in preventing Decedent from developing DVT.

### B. The *Chest* Article

Dr. Holman, Plaintiff's expert witness at trial, testified that Decedent was most appropriately classified as a complex medical patient. Because of this classification, Decedent required anti-coagulant medication to prevent DVT due to his significant ongoing risk for blood clots in his legs. Dr. Holman believed the risk of Decedent bleeding from a prevention dose was very low, so the appropriate course would have been to place Decedent on a prevention dose of Heparin or Lovenox. He opined that the compression devices used on Decedent were inadequate to prevent DVT in Decedent.

Dr. Holman discussed an article in *Chest,* which is a publication of the American College of Chest Physicians. The *Chest* article was designated as Plaintiff's Exhibit 41 for the record. Dr. Holman referred to various sections of the article, including a statement contained in a table that said, "In general surgery patients with multiple risk factors, combining the most effective pharmacologic methods with IPC or DS should offer excellent protection." He indicated that the *Chest* article was 300 pages in length, and that it discussed not only surgical patients, but also medical patients. After explaining that he considered Decedent to be a complicated medical patient, Dr. Holman referred to a section of the *Chest* article that recommended low-dose unfractionated Heparin or low-molecular-weight Heparin for prevention therapy in such patients.

During cross-examination, the bottom table contained on page 134S of the *Chest* article was displayed to the jury. Dr. Holman was asked to look at the four classifications for risk that the table outlined. Dr. Holman agreed that the table addressed four classifications, i.e., low risk, moderate risk, high risk, and highest risk, and that the article was a very important source in determining the proper care for

DVT. Plaintiff offered the *Chest* article as Exhibit 41, which was received without objection.

Defendants' expert, Keith Mankowitz, M.D., also was questioned regarding the *Chest* article, including page 134. Table 2 on the bottom of page 134S was displayed to the jury during the testimony of Defendants' expert Philip Ludbrook, M.D., who discussed the four categories of risk classification referred to in the table.

At the close of all the evidence, Defendants offered various exhibits into evidence, including Defendant's Exhibit D36, "Chest: Prevention of Venous Thromboembolism" (2001). When the trial court asked Plaintiff if she had an objection to any of the exhibits being received, Plaintiff responded that she had "no objection to any of the exhibits being received to the extent that they have been read or shown to the jury. Obviously, some of these are, for example, articles, in which a statement or two was used to perhaps cross-examine a witness, and yet the articles—it might be 10 or 12 pages long. I will not object to the admission of that portion of any record or article which was read or displayed to the jury."

During deliberations, the jury sent out a note asking for three items, including the *Chest* "chart" recommendations. Upon reading the request, the trial court stated that it believed the jury was requesting the "bottom of Page 134S of the chart." Plaintiff's counsel, however, objected, indicating that he thought the jury's use of the word "recommendations" referred to pages 156–158 of the article. Plaintiff's counsel further objected, "Judge, when we moved for the admission of exhibits, I said I didn't have any objection to any exhibits to the extent it was read into evidence. Now, obviously—most of that, even that chart there were only certain references to it, not the entire chart." The trial court

overruled the objection, but sent a cautionary note with the chart exhibit, telling the jury: "If this is not the exhibit you wish to see, please send it out of the jury room immediately."

This appeal follows.

### Points on Appeal

In her first point on appeal, Plaintiff claims the trial court erred in granting DePaul's Motion for Summary Judgment because there existed genuine issues of material fact regarding whether Dr. White consciously intended to discontinue Decedent's anticoagulant (Lovenox) following surgery, and correspondingly, whether prompting by DePaul's nurses would have caused Dr. White to restart Lovenox. Plaintiff submits that Plaintiff's expert, Geraldine Breite, R.N., testified that DePaul nurses should have questioned Dr. White regarding whether Dr. White should resume Lovenox after the surgery and that the DePaul nurses should have advocated that Dr. White resume Lovenox. Plaintiff further contends that the testimony of Plaintiff's expert Russell Holman, M.D., presents additional issues of material fact that defeat DePaul's motion for summary judgment. In particular, evidence from Dr. Holman included his testimony that the failure to resume Lovenox for 10 days contributed to cause Decedent's death and that despite Dr. White's explanation that she intentionally discontinued Lovenox, there was no evidence in the medical records to support this. Dr. Holman's testimony, Plaintiff argues, also supports a reasonable inference from the medical records and testimony that Dr. White forgot to resume Lovenox following surgery on Decedent. Because the credibility of Dr. White's explanation is disputed, Plaintiff argues that the causal issue of whether questioning by DePaul's nurses of Dr. White about the withholding of Love-

nox from Decedent would have prompted Dr. White to restart the anti-coagulant was an issue to be resolved by the jury.

The essence of Plaintiff's second point is that the trial court erred in denying Plaintiff leave to amend her Petition to include allegations relating to the use of sequential compression devices (SCDs). Plaintiff alleges the court erred in striking such allegations because there was evidence that DePaul's nurses failed to properly apply the SCDs, which allowed blood clots to develop that contributed to cause his death, and that the SCD issue was first raised by DePaul's expert Dr. Michael Cox in his deposition on September 10, 2008. Plaintiff argues that she promptly sought leave to amend to address the issue after it was raised by Dr. Cox, and that DePaul knew by virtue of its own expert and its own records that the proper use of SCDs was likely to be an issue at trial, and therefore, DePaul could not have been surprised or prejudiced by such amendment. Plaintiff avers the trial court's denial caused her to suffered hardship and constituted an injustice.

In her third point, Plaintiff claims the trial court erred in responding to the jury's request for "the Chest 'chart' recommendations" when it provided "Table 2" of the *Chest* article. Plaintiff alleges the trial court provided the wrong portion of the *Chest* article sought by the jury, and gave the jury portions of the *Chest* article which were not in evidence. Plaintiff argues that the request made by the jury was unclear and ambiguous and that by giving the jury "Table 2" of the *Chest* article rather than the "Recommendations" section, the trial court allowed a small portion of the lengthy *Chest* article which supported Defendants' case to be emphasized. Plaintiff further alleges in her third point that not all portions of the *Chest* article given to the jury had been read or admitted into evidence and that "Table 2" of the *Chest* article given to the jury had not been fully received in evidence. Plaintiff lastly argues that the jury's request suggested that the jury wanted to review the "Recommendations" section of the *Chest* article that supported Plaintiff's case, and not "Table 2" that supported Defendants' case.

### Standard of Review

We review a grant of summary judgment de novo. *United Mo. Bank, N.A. v. City of Grandview*, 105 S.W.3d 890, 895 (Mo.App. W.D.2003). We affirm where the moving party establishes the absence of any genuine issue of material fact and its right to judgment as a matter of law. *Id.*

▮▮▮ A trial court's denial of leave to amend is within its sound discretion, and we will not disturb its decision absent a showing that the court palpably and obviously abused that discretion. *Baker v. City of Kansas City*, 671 S.W.2d 325, 329 (Mo.App. W.D.1984).

▮▮▮ Trial courts likewise have broad discretion in deciding which exhibits may be taken into the jury room, thus we review such claims of error for abuse of discretion, also. *Pollard v. Ashby*, 793 S.W.2d 394, 403 (Mo.App. E.D.1990).

### Discussion

#### Point I—Summary Judgment

In her first point, Plaintiff claims the trial court erred in granting DePaul's Motion for Summary Judgment because genuine issues of material fact existed as to whether Dr. White consciously intended to discontinue Decedent's anticoagulant (Lovenox) following surgery and whether any inquiry or advocacy by the nurses at DePaul would have caused Dr. White to restart Lovenox.

Plaintiff argues sufficient evidence exists to dispute the credibility of Dr. White's testimony that she made a conscious decision to withhold Lovenox from Decedent following his surgery. In support of her claim, Plaintiff emphasizes the lack of any documentation contained in Decedent's medical records by Dr. White indicating that she intentionally made a decision not to restart Decedent's Lovenox. Plaintiff contends that this absence, combined with expert testimony, supports a reasonable inference from which a jury could conclude that Dr. White forgot to resume Lovenox following Decedent's surgery, and that had the nurses at DePaul questioned Dr. White about the Lovenox as was their duty, Dr. White would have restarted Decedent on Lovenox.

■ As a defendant, to be entitled to summary judgment, DePaul must establish a right to judgment as a matter of law by showing: 1) facts that negate any one of Plaintiff's elements facts; 2) that Plaintiff, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the jury to find the existence of any one of Plaintiff's elements; or 3) that there is no genuine dispute as to the existence of each of the facts necessary to support a properly-pleaded affirmative defense. *United Mo. Bank, N.A.*, 105 S.W.3d at 895.

■ To establish medical malpractice, Plaintiff must establish that: 1) an act or omission of the defendants failed to meet the required standard of care; 2) the defendant was negligent in the performance of the act or omission; and 3) the act or omission caused Decedent's injury. *Montgomery v. South County Radiologists, Inc.*, 168 S.W.3d 685, 691 (Mo.App. E.D. 2005).

■ The third element required to prove a medical malpractice claim is the focus of this point on appeal. In her deposition, Nurse Breite testified that the De-

Paul nurses should have questioned the withholding of Decedent's Lovenox after his surgery, and that the standard of care required the post-operative nurses to seek such clarification. In his deposition, Dr. Holman testified of his concern that "there may have been some responsibility of the nursing staff to inquire around anticoagulation being held around June 7th and thereafter in terms of when that medication would either be continued or permanently discontinued." Additionally, Dr. Holman attested in his affidavit that he believed the nurses' actions or failure to act did cause or contribute to Decedent's death because the nursing staff failed to advocate for Decedent to his doctors or to question the doctors regarding the "hold" order for the Lovenox.

In its Motion for Summary Judgment, DePaul argued that Plaintiff had not produced, and would not be able to produce, evidence that any alleged negligence of DePaul or its employees caused or contributed to cause Decedent's death. On appeal, DePaul argues that "Dr. White unequivocally testified in her deposition that not restarting Lovenox was a conscious decision," and that Dr. White would not have restarted the medication even if the nursing staff had questioned her regarding the "hold" order. We do not conclude that Dr. White's testimony that she made a conscious decision not to restart Decedent on Lovenox mandates a jury finding that Dr. White would not have restarted the anti-coagulant medication even if the nursing staff had advocated for Decedent, questioned Dr. White regarding the "hold" order, and suggested that Lovenox be restarted. We note the absence of any direct deposition testimony from Dr. White on this issue. We further note that Dr. Holman's deposition testimony raises a reasonable inference that the absence of documentation in the Decedent's medical records could lead a person to believe the medication was not restarted due to an

oversight, and not a conscious decision. Dr. Holman stated in his affidavit that a reasonable doctor, if prompted by nurses concerning the medication's discontinuance, would have been expected to restart the Lovenox because Decedent needed the medication to prevent blood clots.

■ "[T]he rule that the non-movant is 'given the benefit of all reasonable inferences' means that if the movant requires an inference to establish his right to judgment as a matter of law, and the evidence reasonably supports any inference other than (or in addition to) the movant's inference, a genuine dispute exists and the movant's prima facie showing fails." *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993). We find that the summary judgment evidence before the trial court reasonably supported an inference other than that suggested by DePaul, and that a genuine issue of material fact existed with regard to the element of causation.

■ DePaul suggests that Dr. Holman's affidavit should not be considered as evidence on the summary judgment. DePaul supports this position by stating that the trial court "would have been well within its discretion to strike or ignore the Affidavit," because the affidavit was submitted in close proximity of the trial date and because of issues relating to Dr. Holman's qualification to testify concerning nursing issues. Our review of the complete record finds no basis to conclude that Dr. Holman's affidavit was not part of the summary judgment record considered by the trial court. The affidavit was included as part of Plaintiff's properly and timely filed response to DePaul's motion for summary judgment. There is no indication in the record that the trial court struck the affidavit; thus, it was part of the summary judgment record before the trial court. Although the trial court may have accepted Dr. White's testimony as to her reasons

for not restarting Decedent on Lovenox after his surgery, in so doing the trial court chose to disregard the summary judgment evidence that reasonably challenged the credibility of Dr. White's explanation. As a result, the trial court made a credibility determination not permitted when considering summary judgment motions. *United Mo. Bank, N.A.*, 105 S.W.3d at 898.

DePaul also contends that "Plaintiff totally failed to set out any evidence that a 'suggestion' made by a nurse would have somehow caused Dr. White to act differently after having already undertaken a risk-benefit analysis as to whether to resume the Lovenox." While DePaul may certainly argue this point to a jury, its argument overlooks the fact that, even if Dr. White's testimony that she consciously chose to withhold Lovenox were accepted as true, this testimony does not rebut Dr. Holman's sworn affidavit assertion that a reasonable doctor would have restarted Lovenox if the nurses had advocated for Decedent. Which medical professional's testimony would prevail was for a jury to decide.

■ When arguing its summary judgment motion before the trial court, DePaul claimed that plaintiff's own nursing expert, Nurse Breite, acknowledged that Dr. White would have declined to follow any suggestion of the nursing staff regarding Lovenox given her conscious decision to discontinue the medication. First, we do not read Nurse Breite's testimony as broadly as DePaul. Second, while DePaul now argues that Dr. White is the only person who can testify as to how she would have responded to a nursing inquiry about the Lovenox "hold" order, Plaintiff submitted evidence through Dr. Holman's affidavit that a reasonable physician would have resumed the Lovenox in that situation. The record before us does not contain summary judgment evidence that counters

Plaintiff's assertion with evidence establishing that Dr. White would have declined to restart the Lovenox had there been a nursing inquiry about the Lovenox "hold". Notably, there was no direct summary judgment evidence from Dr. White that she would have rejected any suggestion from the nursing staff to resume Decedent on Lovenox. Lastly, DePaul's argument ignores the rule that where, as here, the evidence reasonably supports another inference, a genuine dispute exists and summary judgment is thus inappropriate. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 382. We further note that Dr. White's own deposition testimony could reasonably support an inference that advocacy from the nursing staff may have caused her to consider the reinstitution of the Lovenox: when asked how long the Lovenox was to be held, Dr. White replied, "Until it was determined that it was appropriate to resume it."

Giving Plaintiff the benefit of all reasonable inferences, we determine that DePaul's right to summary judgment not only requires evidence that Dr. White made a conscious decision to not restart Decedent on Lovenox, but also an inference that Dr. White would not have reinstituted the medication even had she been approached by the nursing staff. Likewise, we determine the evidence supports another inference, that Dr. White did not restart Decedent on Lovenox due to her oversight, and that she would have reinstated Decedent's Lovenox had the nursing staff questioned her regarding the "hold" order. Consequently, a genuine dispute exists and summary judgment for DePaul is inappropriate. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 382. The trial court erred in entering summary judgment for DePaul.

Point granted.

*Point II—Leave to Amend Petition*

In her second point, Plaintiff claims the trial court in denying Plaintiff leave to amend the Petition to include as an allegation against DePaul "Defendant failed to properly use the sequential compression devices on decedent's legs which resulted in bilateral deep venous thrombus formation which required the administration of full dose IV Heparin and Coumadin." Plaintiff asserts that she should have been granted leave to include this allegation because the issue was first raised by DePaul's expert Dr. Michael Cox in his September 10, 2008 deposition. Plaintiff moved to file Plaintiff's First Amended Petition on September 17, 2008.

■■■■ "Although the rules stress liberality in allowing amendments to pleadings, a party does not have an absolute right to file even a first amended petition." *Baker v. City of Kansas City*, 671 S.W.2d 325, 329 (Mo.App. W.D.1984). The amendment rules function to enable a party to present matters that were overlooked or unknown when the party original filed its pleading, without altering the original cause of action. *Id.* Denying leave to amend lies soundly within the trial court's discretion. *Id.* Absent a showing of abuse, we will not disturb its decision. *Id.*

■■■■ In determining whether an abuse occurred, we consider: 1) the hardship a denial would cause to the moving party; 2) the reasons for the moving party's omission of the matter in the original pleadings; and 3) the injustice a grant of leave would cause to the nonmoving party. *Lester v. Sayles*, 850 S.W.2d 858, 869 (Mo. banc 1993).

■■■■ In reviewing the trial court's action given our standard of review, we note that the trial court here actually granted Plaintiff leave to file an Amended Petition on September 17, less than three weeks before the scheduled trial. Plaintiff was allowed to add the allegation regarding DePaul's failure to question Dr. White or advocate for Decedent to Dr. White for the

re-ordering and continuance of Lovenox. The trial court did not allow Plaintiff to amend her petition to include the following:

> **d. Defendants failed to properly use the sequential compression devices on Decedent's legs resulting in bilateral deep venous thrombus formation which required the administration of full dose IV Heparin and Coumadin."**

Plaintiff claims that the use of the SCDs by DePaul's nursing staff was not an issue before Dr. Cox's deposition, and that Dr. Cox's testimony that the *Chest* article justified the use of SCDs without anti-coagulant medication when treating a patient in Decedent's medical condition first prompted Plaintiff's counsel to review DePaul's medical records to determine if the SCDs had been used properly. Plaintiff's rejected amendment was thus a new factual allegation that had not been fully explored, despite the parties' extensive pre-trial discovery. Introducing a new factual allegation into the petition clearly would have prejudiced DePaul. With less than three weeks to trial, DePaul would have been forced to defend against a new factual allegation, likely requiring an expert evaluation and opinion. Moreover, the reason given by Plaintiff for her failure to include the matter in the original pleading is not compelling. We find no error or abuse of discretion in the trial court's decision.

Point denied.

*Point III—Sending "Table 2" to the Jury*

In her third point, Plaintiff claims the trial court erred in responding to the jury's request for "the Chest 'chart' recommendations" by providing "Table 2" of the *Chest* article. Plaintiff contends the trial court provided the jury with the wrong portion of the *Chest* article and provided portions of the article that were not admitted into evidence. Plaintiff argues that the jury's request suggested that the jury wanted to review the "Recommendations" section of the article rather than "Table 2," and asserts that by giving "Table 2' to the jury, the trial court emphasized a small portion of the lengthy article, a portion that supported Defendants' position.

First, the record refutes Plaintiff's assertion that "Table 2" of the *Chest* article was not admitted into evidence. The entire *Chest* article was offered by *Plaintiff* and received by the trial court without objection. When Defendant also offered the *Chest* article as one of several exhibits, Plaintiff responded that she did "not object to the admission of that portion of any record or article which was read or displayed to the jury." The record clearly shows that "Table 2," contained on the bottom of page 134–S of the *Chest* article, was not only displayed to the jury during testimony by Dr. Holman and Dr. Ludbrook, but also was referred to and discussed by Dr. Holman, Dr. Mankowitz, and Dr. Ludbrook.

As to Plaintiff's contention that the trial court sent the wrong portion of the article to the jury, the record likewise supports the trial court's interpretation that the jury's request for the "Chest 'chart' recommendations" referred to Table 2. Moreover, the cautionary note sent with the chart exhibit alerted the jury and provided it the opportunity to correct the trial court's response to its request.

Trial courts have "discretion to allow or disallow requests to take to the jury room those exhibits that have been properly admitted in evidence." *Lester,* 850 S.W.2d at 863. "This discretion may be invoked even for articles admitted in evidence merely to illustrate or explain the testimony of witnesses." *Id.*

Table 2 is part of a properly admitted exhibit that was displayed to the jury on more than one occasion. Table 2 was used to question several witnesses by both Plaintiff and Defendants. The trial court did not err and properly exercised its dis-

cretion with regard to the jury request for the Chest chart recommendations.

Point denied.

### Conclusion

The trial court's grant of summary judgment in favor of Defendant DePaul is reversed and remanded for further proceedings. The judgment entered in favor of Dr. White, Digestive Disease Specialists, Inc. Dr. Anderson, and Esse Health is affirmed in all other respects.

GEORGE W. DRAPER III, J., and ROY L. RICHTER, J., Concur.